**Kerry L. MILLER, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 70A04–9109–CR–296.**

Court of Appeals of Indiana, Fourth District.

June 28, 1993.

⚷641.1

L.R. Turner, Richmond, for appellant.

Linley E. Pearson, Atty. Gen., Richard C. Webster, Deputy Atty. Gen., Indianapolis, for appellee.

MILLER, Judge.

Kerry L. Miller (Kerry), an alcoholic with Rambo delusions, was convicted by jury of Confinement, a class B felony,[1] and Criminal Recklessness, a class D felony,[2] and sentenced to thirteen (13) years incarceration. Kerry was armed with a $CO_2$ gas powered .177 caliber pellet gun which looks exactly like a Model 92 Beretta 9mm semiautomatic pistol, the handgun carried by the Indiana State Police. Kerry claims that his Sixth Amendment right to counsel was violated because his trial counsel was ineffective. We do not agree.

However, we raise *sua sponte* whether the evidence was sufficient to support his B felony conviction.[3] We find that it was not and vacate his conviction for Confinement as a B felony. We find that the evidence supports his conviction for the lesser included offense of Confinement as a class D felony.

We affirm in part and reverse and remand in part.

---

1. Ind.Code 35–42–3–3.

2. Ind.Code 35–42–2–2(a).

3. This court has said that a "conviction of an offense where evidence and reasonable inferences of a material element of the offense are totally lacking [constitutes fundamental error]." *Meredith v. State* (1982), Ind.App., 439 N.E.2d 204, 208. "Inasmuch as this fundamental error is apparent on the face of the record, we are compelled to reverse [the defendant's] convictions *sua sponte,* although the issues he raises on appeal do not involve this error." *Id.* "Fundamental error is error that, if not rectified, would deny a defendant fundamental due process." *Warriner v. State* (1982), Ind., 435 N.E.2d 562, 563, *citing Johnson v. State* (1979), 271 Ind. 145, 390 N.E.2d 1005, *cert. denied sub nom.* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312. The Supreme Court has held: "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction *except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship* (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (emphasis added).

## FACTS

The facts most favorable to the verdict are that at about 10:50 p.m. on April 28, 1990, Rodney Howell (Howell) was returning to his home in Milroy, Rush County, Indiana. As he drove a friend's car down Walnut Street, he was confronted by a man wearing military camouflage clothing. The man pointed a handgun at the windshield of the car and Howell stopped. To Howell, a person familiar with handguns, the gun appeared to be a 9mm Beretta. Howell recognized the man as Kerry Miller. Kerry then ordered Howell to get out of the car and assume a "push-up" position. Howell complied. Kerry then told Howell to put his hands behind his head and his elbows in front of his eyes. The record does not indicate if Howell was on the ground or standing at this point. Howell complied. Howell saw a movement out of the corner of his eyes and heard a click. He testified that he thought that Kerry was going to shoot.

Howell then told Kerry his name in the hope that Kerry would recognize him and not shoot. Kerry recognized Howell, put the gun in his waistband, made an obscene and senseless comment to Howell, and then said that Howell would now have to come and party with him. Kerry told Howell to come into his house and Howell complied (the incident happened in front of Kerry's home and took place over a period of about fifteen (15) minutes).

Kerry was drinking gin and orange juice and compelled Howell to take a sip of gin. The pellet gun was laying on Kerry's desk at the time. Howell convinced Kerry that he had to go home and Kerry said he could, but added that Howell was to return within five or ten minutes or else Kerry would come and get him, and that he (Kerry) would be armed. Howell arrived at his home agitated, told his friends that were present what had happened, and then returned to Kerry's house. Kerry then changed his clothes and returned to Howell's house with Howell, without the pellet gun. Once at Howell's house, the conversations continued to make little sense to anyone except when Kerry referred to his pellet gun saying that he "had fifteen in the clip and one in the pipe." [Translated: fifteen rounds in the magazine (clip) and one in the firing chamber.] Finally, while on the porch, Kerry picked a fight with one of Howell's friends, Marc Houston (Houston). Houston then proceeded to "beat the hell out of" Kerry. Howell and his friends went back into the house and called the police.

Kerry was arrested near his home by Deputy Click and Officer Trout and charged with confinement and criminal recklessness.[4] Kerry showed obvious signs of intoxication and was bleeding from the nose and mouth. Kerry did not have the pellet gun on him. The officers obtained a search warrant and found the pel-

---

**4.** Kerry was charged with one count of confinement as a B felony and with one count of criminal recklessness, a D felony. Both Informations state that the offense charged occurred "while said Kerry L. Miller was armed with a deadly weapon, a handgun." R. 54. The term "handgun" is not defined in the deadly weapon statute. The Handgun Statute, Ind.Code 35–47–2–1 et seq. contains the definition and various prohibitions. A license is required to carry a handgun in Indiana.

Ind.Code 35–47–2–1 states: Carrying of handgun prohibited; exceptions

Sec. 1. Except as provided in section 2 of this chapter, a person shall not carry a handgun in any vehicle or on or about his person, except in his dwelling, on his property or fixed place of business, without a license issued under this chapter being in his possession.

Ind.Code 35–47–1–6 states:

Sec. 6. "Handgun" means any *firearm:*
(1) designed or adapted so as to be aimed and fired from one (1) hand, regardless of barrel length; or
(2) any firearm with:
(A) a barrel less than sixteen (16) inches in length; or
(B) an overall length of less than twenty-six (26) inches.
(Emphasis added).
Webster's defines a handgun as "a firearm held and fired with one hand." Webster's Third International Dictionary 1027 (1976).
Ind.Code 35–47–2–23 provides in pertinent part:
(c) A person who violates section 1 ... of this chapter commits a Class A misdemeanor. However, the offense is a Class D felony if the person has a prior conviction of any offense under this subsection, or if the person has been convicted of a felony within fifteen years before the date of the offense.

let gun in Kerry's desk drawer. It was loaded with pellets, but it appears from the record that there was no $CO_2$ gas cartridge in the pellet gun. After a day and a half trial, the jury found Kerry guilty as charged.

## DECISION

### I. INEFFECTIVE COUNSEL

 Kerry claims that he was denied his Sixth Amendment right to a fair trial because his defense attorney's performance was so defective that it undermined the proper function of the adversarial process so that his trial cannot be relied on having produced a just result. The Federal Constitution guarantees a fair trial by the Due Process Clause and through the provisions of the Sixth Amendment. *Strickland v. Washington* (1984), 466 U.S. 668, 684, 104 S.Ct. 2052, 2062, 80 L.Ed.2d 674. Indiana has long recognized that the right to counsel is fundamental to our system of justice. More than a century before *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, the Indiana Supreme Court held that a criminal defendant had a right to an attorney at public expense if he could not afford one himself.[5] *Webb v. Baird* (1854), 6 Ind. 13. Indiana also recognizes that the right to counsel is the right to effective counsel and follows the two part *Strickland* standard. Our supreme court has set forth the standards for reviewing a claim of ineffective assistance of counsel thus:

> Reversal for ineffective assistance of counsel is appropriate in cases where a defendant shows both (a) that counsel's performance fell below an objective standard of reasonableness, and (b) that the deficient performance so prejudiced the defendant as to deprive him of a fair trial. A claim of ineffective assistance must identify the claimed errors of counsel, so that the court may determine whether, in light of all circumstances, the counsel's actions were outside the range of professionally competent assistance.

The proper measure of attorney performance is reasonableness under prevailing professional norms. It shall be strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Judicial scrutiny of counsel's performance is highly deferential and should not be exercised through distortion of hindsight. Isolated poor strategy, inexperience, or bad tactics do not necessarily amount to ineffectiveness of counsel. If deficient performance of counsel can be proven, defendant must further show show a reasonable probability that it altered the outcome of the case.

*Mftari v. State* (1989), Ind., 537 N.E.2d 469, 473–74.

 Isolated poor strategy, inexperience or bad tactics do not necessarily amount to ineffective counsel. *Elliott v. State* (1984), Ind., 465 N.E.2d 707. In order to ascertain whether trial counsel's performance was deficient the court must look to the totality of the evidence to determine whether there is a reasonable probability that, but for counsel's errors, the outcome would have been different. *Brockway v. State* (1987), Ind., 502 N.E.2d 105. Judicial scrutiny of counsel's performance is highly deferential and should not be exercised through the distortions of hindsight. *Slaton v. State* (1987), Ind., 510 N.E.2d 1343.

Kerry argues that his counsel's failure: (1) to object to any of the hearsay testimony; (2) to object to "expert" testimony where no foundation had been laid; (3) to cross examine most of the State's witnesses; (4) to object to irrelevant testimony; as well as (5) ineffective and inadequate cross examination of the complainant, Howell, so prejudiced him that he did not receive a fair trial. Kerry notes that his trial counsel did not object to anything or anyone—whatever or whoever the State wanted to put in or on, the State did—without objection.

---

5. *See* Randall T. Shepard, *Second Wind for the Indiana Bill of Rights,* 22 *Ind.L.Rev.* 575, 578 (1989).

■ It is clear that with or without effective counsel, Kerry would have been convicted of criminal confinement as a class D felony.[6] He admitted intentionally ordering Howell out of the car without Howell's consent and confining him for about fifteen (15) minutes.[7] The jury did not accept Kerry's defenses for his acts, i.e., self-defense and voluntary intoxication. Counsel's performance, while not the best, does not sink to the level of ineffective counsel.

## II. SUFFICIENCY OF THE EVIDENCE

■ The dispositive element here is whether the State proved Kerry was *guilty as charged* in the Informations and Jury Instruction No. 2—i.e., that Kerry confined Howell "while armed with a deadly weapon, namely, *a handgun* (emphasis added)." R. 54. Throughout this case, from the Information to the Jury Instructions, the concepts of deadly weapon, firearm, and handgun were confused and intermixed. By statute a handgun is a firearm. *See* N. 4, *supra*. By inserting the phrase "namely, a handgun" in the information, the State chose to limit the charges against Kerry to the illegal use of a firearm. The Record is devoid of any attempt to amend the charges against Kerry by deleting the term "a handgun" and expanding the charge against him to a broader charge— "while armed with a deadly weapon."

The element of "while armed with a deadly weapon" elevates Kerry's crime to a class B felony.[8] Instruction No. 6 explained that "the word firearm means any weapon that is capable of or designed to or that may readily be converted to expel a projectile by means of an *explosion* (emphasis added)." [9] Instruction No. 5 defined "deadly weapon":

"The term 'deadly weapon' is defined by law as meaning:

a. a loaded or unloaded firearm; or

b. a weapon, device, taser (as defined in I.C. 35–47–8–3) or electronic stun weapon (as defined in I.C. 35–47–8–1), equipment, chemical substance, or other material that in the manner it is used, or could ordinarily be used, or is intended to be used, is readily capable of causing serious bodily injury." [I.C. 35–41–1–8 as added by P.L.311–1983, section 9, P.L.31–1985, section 1.]

Finally, Instruction No. 7 stated that "where different conclusions can be reached as to whether or not the weapon is deadly, it is a question of fact for the jury to determine from the description of the weapon, the manner of its use and the circumstances of the case."

---

**6.** The trial court declined to sentence Kerry for Criminal Recklessness, a class D felony, because the judge perceived a potential double jeopardy situation due to the manner in which the offenses were charged. As noted by this court in *Abron v. State* (1992), Ind.App., 591 N.E.2d 634, *trans. denied,* "[w]here the conviction of a greater crime cannot be had without commission of the lesser crime, double jeopardy considerations bar separate conviction and sentencing upon the lesser crime when sentencing is imposed on the greater." *Id.* at 636. The proper remedy is to vacate the conviction and sentence (if any) for the lesser crime. *Id.* at 637.

**7.** The statute defining the offense of confinement which was in effect at the time of the offense charged reads in part:

"A person who knowingly or intentionally: (1) Confines another person without the other person's consent; or (2) Removes another person by fraud, enticement, force, or threat or force, from one place to another; commits criminal confinement, a class D felony. However, the offense is a class B felony if it is committed while armed with a deadly weapon . . .

Final Instruction No. 2 explained that to convict the Defendant, the State must have proved each of the following elements:
(1) The defendant, Kerry L. Miller;
(2) knowingly and intentionally;
(3) confined Rodney Howell without his consent by ordering Rodney Howell from a motor vehicle.
R. 73.

**8.** The trial court explained that "[i]f the State further proved beyond a reasonable doubt that the offense was committed while armed with a deadly weapon, you should find the defendant guilty of criminal confinement a class B felony. Instruction No. 2, R. 73.

**9.** This definition is almost a direct quote of I.C. 35–47–1–5. A more technically accurate definition of a firearm is "[a]n instrument used in the propulsion of shot, shell, or bullets by the action of gunpowder exploded within it. A weapon which acts by force of gunpowder." Black's Law Dictionary (4th ed. 1968).

These are correct statements of law, but not all are applicable in this case. Kerry was specifically charged with violating I.C. 35–41–1–8(1), not subsection (2) thus, there was no need for Instruction No. 6. Likewise, because Kerry was charged with violating § (1), there was no need for Instruction No. 7. Kerry was only charged with violating § (1), therefore, an instruction regarding § (2) was error.[10]

■ We recognize that under our statute, a weapon or device need not be a firearm to be a "deadly weapon." The statute states that for a weapon or device to be considered a deadly weapon (other than a firearm), it must be, "in the manner it is used, or could ordinarily be used, or is intended to be used, ... readily capable of causing serious bodily injury." *Id.*

We also note that Indiana courts have held that pellet or BB guns can be considered deadly weapons within the statute. *See e.g., Glover v. State* (1982), Ind., 441 N.E.2d 1360; *Williams v. State* (1983), Ind. App., 451 N.E.2d 687. Each case involved a violent crime and in each the court determined that the device used was a deadly weapon because of the actual ability of the gun to function as a weapon capable of inflicting serious bodily injury under the factual circumstances. However, in each case the defendant was charged under § (2) (or its predecessor). *See also, Frey v. State* (1991), Ind.App., 580 N.E.2d 362, 364. *Frey* too involved a pellet gun. In *Frey,* the defendant actually fired the weapon (unlike the defendants in the cases cited above), a pellet rifle, and hit the complainant four times—in the shin, calf, thigh, and buttocks. *Id.* Thus, it was clearly apparent that the pellet rifle was readily capable of causing serious bodily injury—it had.

However, in the instant case, Kerry was charged with the illegal use of a handgun—a firearm. The State clearly established, through the uncontroverted testimony of Deputy Click, that Kerry's pellet gun was not a handgun. Thus, there was a variance between the information, the instructions, and the proof produced at trial. "A variance is an essential difference between the pleading and the proof." *Muligan v. United States* (8th Cir.1903), 120 F. 98, 99. A variance, to warrant reversal, "must be a substantial one, *such as might mislead the defense....*" *Madison v. State* (1955), 234 Ind. 517, 130 N.E.2d 35, 48 (Arterburn, J., concurring).[11] Judge Arterburn further explained: "In other words, the test [for a fatal variance] is, ... was the defendant misled by the variance in the evidence from allegations and specifications in the charge in the preparation and maintenance of his defense, and was he harmed or prejudiced thereby?" *Id.*

It is clear from the record that Kerry's counsel based her primary defense on the information, i.e., that Kerry was charged with using a firearm in committing the crime charged. Counsel moved for a directed verdict at the close of the State's case arguing that the State had clearly

---

**10.** As per the statute, a firearm is a deadly weapon whether loaded or unloaded, whether functional or non-functional. The modifying clause in (2), "readily capable of causing bodily injury" does not apply to a firearm in part (1) of the statute.

**11.** The *Madison* court explained the meaning of "variance" thus:

" 'Thus where it is charged that the defendant stole a white horse, proof that a black horse was stolen will not suffice.' *McCallister v. State* (1940), 217 Ind. 65, 26 N.E.2d 391, 392. If the State fails to prove any horse was stolen it is a failure of proof, but if the state proves a horse different from that charged was stolen it is a variance, but logically it is still a failure to prove the charge made. In either case it is

cause for a motion for a new trial because the verdict or finding of the court would not be sustained by sufficient evidence.... Not all of the reasoning [in cases on variance and failure of proof] can be reconciled with the well established rules under our Bill of Rights and the better reasoned cases, but the general rule has been well recognized from the first that 'a failure to prove a material allegation descriptive of the offense is fatal.' " *Madison, supra,* 130 N.E.2d at 42. The court added the following footnote to the above:
4. *"If the thing charged to have been stolen is described in the indictment with greater particularity than the law requires, the unnecessary descriptive averments cannot be rejected as surplusage, but must be proved as alleged.* 36 C.J. 852, § 372; 52 C.J.S., Larceny, § 96." *Id.* (emphasis added).

shown that the gun in question was a pellet gun, not a firearm,[12] therefore Kerry could not be guilty as charged. R. 319. At closing argument counsel said: "[t]hat a pellet gun is not a firearm. If it's not a firearm, it's not a deadly weapon [as charged in the information]. If it's not a deadly weapon, then Kerry Miller is not guilty." R. 495. The State proved beyond a reasonable doubt that the pellet gun was not a firearm. In *Madison*, our supreme court addressed a similar issue and said:

> If the state had charged the decedent was killed by a gun loaded with gunpowder and metal bullets, it would be a fatal variance to permit a conviction to stand when the evidence showed he was killed

by a blow-gun or an air rifle ... although each weapon throws missiles that can cause death.... When the state failed to prove this essential allegation, the verdict was not sustained by sufficient evidence.

*Madison, supra,* 130 N.E.2d at 44–45. Our supreme court's reasoning in *Madison* is dispositive of Kerry's case. Therefore, we find that the evidence was insufficient to convict Kerry of the crimes with which he was charged: (1) criminal confinement while armed with a deadly weapon— "namely, a handgun"—as a class B felony; or (2) criminal recklessness as a class D felony because he was not armed with a deadly weapon—"namely, a handgun, which created a substantial risk of bodily

---

**12.** The State introduced the "expert" testimony of Deputy Click as to the operation of the pellet gun. R. 221–22. When asked by the State if the pellet gun was loaded, he answered "[y]es, it was."

Q. How was it loaded?
A. It was loaded with pellets.
R. 215.

The State then called Trooper Mike Ooley of the Indiana State Police, apparently as an expert, though the Record is devoid of any foundational questions. The questioning of Trooper Ooley by the State went as follows:
Q. Mike, are you assigned a weapon by the Indiana State Police?
A. Yes, I am.
Q. What is the weapon that the Indiana State Police routinely assigns?
A. It's the Beretta G–92 semiautomatic 9mm.
Q. What does the G–92 mean?
A. It's just a model number ...
Q. And what does the 9mm mean?
A. It's the uh, caliber of gun that it is.
Q. And Beretta? ...
A. That's just a—a brand name.
Q. Trooper Ooley, I'm going to hand you what's already been marked and identified here State's Exhibit No. 1 and ask what it looks like?
A. It looks like the 9mm I carry.
Q. By looking at that, do you see any differences between that and the firearm that the Indiana State Police have assigned you?
A. There is a slight difference....

 * * * * * *

Q. Fire the same way?
A. I'm sure it does—pull the trigger.
Q. What about uh, clip operation?
A. Okay, this clip slides out the bottom of the handle—or the grip; this clip doesn't—*I don't know how this gun works, but I'm sure there*

*has to be a place inside there someplace for a gas cartridge.* (Emphasis added).
Q. Why a gas cartridge?
A. That's how these pellet guns are operated, off of—off of gas.
Q. When you say they're operated off of gas, what happens with pellet guns?
A. It's just the pressure; that's how it gets its force, is from the pressure inside the uh, the gas chamber.
Q. What happens with the gas chamber that causes pressure?
A. I have no idea.

 * * * * * *

Q. And is this a semiautomatic?
A. Mine is.
Q. Okay. Are Berettas, 9mm Berettas, semiautomatic?
A. Yes.

 * * * * * *

Q. If, if you pull the trigger on that gun until it clicks—until you hear a click—what do you have to do to make it fire?
A. Nothing—mine's going to fire.
Q. When it clicks?
A. When the trigger's back.
R. 253–58.

Kerry's counsel then cross examined:
Q. I just have a couple, Trooper Ooley. Uh, first of all, how do you spell Ooley?
A. O—OOLEY.
Q. Now, the handgun that is your State Police issue, this 92–G—
A. Right.
Q. —Beretta, you have to have a license to carry that, do you not?
A. Yes, you do.
Q. And the pellet gun that's in evidence as State's Exhibit 1, you don't have to have a license to carry that, do you?
A. Not that I'm aware of.
Q. I have no further questions.
R. 259–60.

injury...." R. 54. *See In re Winship, supra,* n. 3.

[9] We therefore vacate Kerry L. Miller's conviction for Criminal Confinement as a class B felony and remand to the trial court with instructions to sentence Kerry for the lesser included offense, Criminal Confinement as a class D felony.[13]

CONOVER, J., concurs.

RUCKER, J., concurring in part and dissenting in part with separate opinion.

RUCKER, Judge, Concurring in part and Dissenting in part.

I agree with the majority that Miller failed to demonstrate his trial counsel rendered ineffective assistance. However, I cannot agree with the majority's conclusion that the State failed to prove Miller confined Howell while armed with a handgun. As the majority points out "handgun" is defined as a "firearm." Ind.Code § 35–47–1–6. "Firearm," in turn, is defined as "any weapon that is capable of or designed to or that may readily be converted to expel a projectile by means of an explosion." Ind. Code § 35–47–1–5. The evidence in this case demonstrates Miller's pellet gun is a handgun as defined by statute.

I first observe the majority takes issue with the trial court's tendered Instruction No. 6 which defines firearm in terms nearly identical to the statute. *See* Ind.Code § 35–47–1–5. According to the majority, a more technically accurate definition of firearm is found in Black's Law Dictionary which includes gunpowder as part of the definition. *Op.* at 754, n. 9. Even if we were to assume that Black's definition of firearm is technically accurate, both this court as well as the trial court are bound by the statutory definition. *Consolidation Coal Co. v. Indiana Dept. of State Revenue* (1991), Ind., 583 N.E.2d 1199, 1201 (where the General Assembly has defined a word, the court is bound by that definition even though it conflicts with the common meaning of the word); *Ware v. State* (1982), Ind.App., 441 N.E.2d 20, 23, *reh. denied* (when the Legislature provides a definition for a word, courts are bound by it, regardless of other possible meanings attributable to the word). I find no fault with the trial court's tendered Instruction No. 6. The instruction is consistent with the statute and properly excludes gunpowder as a part of the definition for a firearm.

The question in this case therefore is whether the State presented sufficient evidence to the jury to show that the pellet gun, which Miller used to confine Howell, was either capable of or designed to expel a projectile by means of an explosion. When examining sufficiency claims our standard of review is well settled. We neither reweigh the evidence nor judge the

---

13. Based on the testimony of Trooper Ooley, the dissent finds that the jury could reasonably "infer ... that a projectile ... could be expelled through the barrel of Miller's pellet gun by reason of an explosion, namely sudden violence from internal energy caused by the pressure from $CO_2$ gas." Thus, the jury could conclude that a pellet gun is a handgun. As noted *supra,* a pellet gun has been found to be a deadly weapon depending on the circumstances of the case and the manner in which it is used. However, a pellet gun cannot be considered a handgun as the term is used in the law because carbon dioxide ($CO_2$), the propellant in this case is a non combustible gas and, thus, cannot explode. As noted by the dissent, our supreme court in *Glover v. State* (1982), Ind., 441 N.E.2d 1360, 1362, said that a $CO_2$ pistol derives its force from the expansion of compressed $CO_2$ gas. *See* Rucker, J. Dissenting at n. 1. The expansion of compressed gas that propels the pellet is a physical force, like the force from a compressed spring in a BB gun.

Kerry Miller was charged with using a specific type of deadly weapon, a handgun. When questioned by counsel, Trooper Ooley testified that to the best of his knowledge, a person is not required to have a license to carry a pellet gun. See Op. at 756, R. 260. In Indiana, a person is required to have a license to carry a handgun. I.C. 35–47–2–1; Op. at n. 4. Carrying a handgun without a license is a crime. I.C. 35–47–2–23; Op. at n. 4.

Under the dissent's interpretation of the term "handgun," a pellet gun becomes a firearm and thus, a person would need a license to carry it. The question of whether a device for shooting gas shell cartridges was a "pistol", i.e., a handgun, under the 1935 Firearms Act (which was replaced by the current statute) was considered by the Indiana Attorney General in 1937. He found that it was not. 1937 Op.Atty.Gen. p. 242.

credibility of witnesses. We examine only the evidence most favorable to the State along with all reasonable inferences to be drawn therefrom and if there is substantial evidence of probative value to support the conviction, it will not be set aside. *Litel v. State* (1988), Ind., 527 N.E.2d 1114.

The majority sets forth the relevant testimony of Trooper Ooley concerning the operation of the pellet gun and concludes therefrom "[t]he State proved beyond a reasonable doubt that the pellet gun was not a firearm." *Op.* at 756. I disagree with the majority's assessment of the evidence. Indeed the State demonstrated through Trooper Ooley that the pellet gun did not fire by means of gunpowder. However, as discussed above, gunpowder is not a part of the statutory definition for firearm. Rather, the reasonable inference from the Trooper's testimony revealed the gun was at least designed to expel a projectile by means of an explosion.

Unlike "firearm" the term "explosion" is not defined by statute. Thus we are bound to apply its common and everyday meaning. *Smithhart v. State* (1992), Ind.App., 591 N.E.2d 149. One such common and everyday meaning of explosion is "[T]o cause to burst noisily; to burst forth with sudden violence or noise from internal energy: as ... to burst violently as a result of pressure from within." *Webster's Ninth New Collegiate Dictionary* 438 (1984). Trooper Ooley testified the pellet gun is fired in the same fashion as a 9mm Beretta, by pulling the trigger. He also testified the pellet gun operates from gas pressure in the chamber of the gun.

Granted Trooper Ooley was not an expert on the internal operations of a look-a-like 9mm Beretta. The jury however could reasonably infer from his testimony and from an examination of the weapon itself that a projectile, namely a pellet, could be expelled through the barrel of Miller's pellet gun by reason of an explosion, namely sudden violence from internal energy caused by the pressure from $CO_2$ gas.[1] The evidence here is sufficient to sustain Miller's conviction of Criminal Confinement While Armed with a Handgun as a Class B felony. I would therefore affirm the judgment.

1. As the majority points out in n. 12, carbon dioxide ($CO_2$) is a non combustible gas. I have no quarrel with the majority on this point. *See The Merck Index, An Encyclopedia of Chemicals, Drugs, and Biologicals* 1814 (11th ed. 1989) (carbon dioxide does not burn or normally support combustion); *See also Fundamentals of General, Organic, and Biological Chemistry,* A–9 (1992) (defining combustion as a chemical reaction in which heat and often light are produced and usually refers to burning in the presence of oxygen). However, the fact that carbon dioxide may not be combustible does not resolve the question of whether it is involved in an explosion occurring in the chamber of a pellet gun. *See, e.g., 3 McGraw–Hill Encyclopedia of Science and Technology* 206, 207 (1987) ("Carbon dioxide in a cartridge is used as the propellant in certain pistols"); *Glover v. State* (1982), Ind., 441 N.E.2d 1360, 1362 (defining the weapon in that case as a Crossman .177 caliber pellet pistol which, in ordinary operation, "is held in the hand and when fired expels a .177 caliber metal projectile by compressed gas"). Nor does contending, as does the majority, that the pellet is expelled by "physical force" resolve the question before us. We are here confronted with matters of terminology, definition, and statutory construction. The word "explosion" is not a term of art and because it is undefined by statute we are required to use its plain and ordinary meaning. The plain and ordinary meaning of the term, namely: "to burst forth with sudden violence or noise from internal energy" accommodates a variety of activity that might occur in the chamber of a pellet gun including physical force.

Further, nothing in this dissenting opinion should be construed to mean that a license is required to carry a pellet gun. Whether under the provisions of Ind.Code § 35–47–2–1 *et seq.,* the Legislature so intended has never been addressed by this court and is not before this court today.