Robert WHITFIELD, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 33A05–9709–CR–368.

Court of Appeals of Indiana.

July 28, 1998.

Transfer Denied Sept. 30, 1998.

---

Michael R. Burrow, Jeffrey S. Neel, Wolf & Burrow, Greenfield, for Appellant–Defendant.

Jeffrey A. Modisett, Attorney General, Randi E. Froug, Deputy Attorney General, Indianapolis, for Appellee–Plaintiff.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Defendant–Appellant Robert Whitfield ("Whitfield") appeals following his conviction of robbery with a deadly weapon, a Class B felony.[1]

We affirm.

### ISSUES

Two issues are presented for our review which we restate as:

1. Whether the trial court erred in denying Whitfield's motion to suppress where Whitfield contends he was promised leniency in exchange for his taped confession.

2. Whether the evidence is sufficient to support Whitfield's conviction of robbery with a deadly weapon where the weapon used was a pellet gun with a hollowed barrel.

1. Ind.Code 35–42–5–1; Ind.Code 35–41–1–8.

2. The State filed an amended information on May 1, 1997, and a second amended information

### FACTS AND PROCEDURAL HISTORY

The facts most favorable to the verdict reveal that on October 25, 1996, Ben Hudson was working at the Pic–N–Save convenience store on the east side of Knightstown, Indiana. Sometime between 8:30 and 9:00 p.m., Whitfield came into the store, pointed a gun at Hudson and demanded money. During the robbery, Gary Noble was also in the store, and he observed a second individual who fled with Whitfield. The identity of Whitfield's accomplice was later revealed as Eric Jackson. After Whitfield and Jackson fled, Hudson and Noble locked the store doors and called for the police.

At approximately 11:00 p.m. that same evening, Whitfield and Eric Jackson went to Matt Sherrill's home in Grant City, just north of Knightstown. At trial, Sherrill testified that upon arriving at his home, Whitfield and Jackson were in an excited state. Sherrill then took Whitfield and Jackson to Lee Beaver's house which was east of Knightstown.

Information regarding Whitfield's identity and his involvement in the Pic–N–Save robbery came to police from John Juday. In November of 1996, Juday was on probation, and the police were receiving anonymous complaints regarding Juday. Based on these complaints, Carthage Town Marshall, Jim Fitzwater, visited Juday at his home. It was during this visit that Juday offered information implicating Whitfield in the Pic–N–Save robbery. Specifically, Juday told police that Whitfield told him that he committed the robbery.

On January 6, 1997, Sergeant Steve Martin and Investigator Jay Davis of the Henry County Sheriff's Office took Whitfield from the county jail to the Criminal Investigation Division, advised Whitfield of his *Miranda* rights and obtained a signed, taped confession.

On January 8, 1997, Whitfield was charged with robbery with a deadly weapon, a Class B felony.[2] Whitfield's case was tried to a

on May 6, 1997. The substantive charges were not altered.

jury on May 6th through 8th of 1997, and he was found guilty as charged. Whitfield now appeals.

## DISCUSSION AND DECISION

### I. Motion to Suppress

■ Whitfield contends that the trial court erred in denying his motion to suppress his pre-trial confession. Prior to trial, Whitfield filed a motion to suppress the statement arguing that it was the result of psychological and mental coercion. After hearing argument on the suppression motion, the trial court denied the motion. Whitfield specifically argued that his inculpatory statements were induced by promises and offers of leniency, inferences that criminal charges would not be filed if a self-incriminating statement were obtained, and promises to smoke, to get out of jail and to satisfy anger toward Eric Jackson.

In reviewing a motion to suppress we do not reweigh the evidence, but determine if there was substantial evidence of probative value to support the trial court. *Carter v. State*, 686 N.E.2d 1254, 1258 (Ind.1997). We look to the totality of the circumstances and consider all uncontroverted evidence together with conflicting evidence that supports the trial court's decision. *Haviland v. State*, 677 N.E.2d 509, 513 (Ind.1997), *reh'g denied.* The burden of proof is on the State to prove that a defendant knowingly, intelligently and voluntarily waived his rights under *Miranda. Id.* The critical inquiry into the voluntariness of statements is whether, looking to all of the circumstances, the defendant's statements were induced by "violence, threats, promises or other improper influence." *Page v. State*, 689 N.E.2d 707, 710 (Ind.1997) (quoting *Bivins v. State*, 642 N.E.2d 928, 942 (Ind.1994), *reh'g denied, cert. denied*).

The record reveals that on January 6, 1997, Detective Sergeant Steve Martin of the Henry County Sheriff's Department, was called upon to assist Investigator Jay Davis with Whitfield's interrogation. At the time, Whitfield had just been picked up on a warrant and was serving a sentence in the Henry County Jail. Investigator Davis went to the jail, told Whitfield that his name had come up in a criminal investigation, and escorted him to the Criminal Investigation Division of the Sheriff's Department.

Once in the interrogation room, Detective Martin read Whitfield the Advice of Rights form, gave it to Whitfield to read, and obtained Whitfield's signature. The waiver of rights provided as follows:

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. *No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.*

(R. 269). (Emphasis added). Whitfield then began a long narrative wherein he confessed to his involvement in the Pic-N-Save robbery. Both Detective Martin and Investigator Davis unequivocally deny making any promises of leniency or otherwise to Whitfield in consideration for his confession, and also deny the use of coercion or threats. Just prior to giving his taped statement, Whitfield inquired whether he would be charged immediately, and Investigator Davis told him that the prosecutor's office would make that decision. Detective Martin and Investigator Davis then began their taped questioning of Whitfield. Whitfield cooperated fully and the interrogation remained very cordial.

Whitfield testified at the motion to suppress that he understood his interrogators to be impliedly promising leniency in exchange for his statements implicating the accomplice. When asked whether any promises were made to him in exchange for his confession, Whitfield responded: "Well, I wouldn't actually call it a promise. They didn't say well I promise, but they was asking me, well, if you tell us about Jackson and give us information on Jackson, you know, it'll take all the burden off of your shoulders, and we're more concerned with Jackson than we are with you, and things in that matter." (R. 314). Whitfield further testified that the interview had been going on approximately forty-five minutes to one hour before the taping began. Whitfield also testified that, based on his understanding at the time of interrogation,

he thought that the police were more interested in his accomplice and that it was in his best interest to offer evidence to help the police implicate Jackson. Specifically, Whitfield stated that he believed he would get the "lesser of the two charges" or not be charged at all. (R. 314). In response to this, defense counsel and Whitfield engaged in the following:

Q.... When you say it's the way you understood it, why did you—I mean, what made you understand it that way?

A. They was talkin' like they wasn't really concerned with me. I mean, with—they was concerned, but, with what I did, but ... they was more concerned in what Eric Jackson had done than what I had done.

* * * * * *

Q. What made you decide that you wanted to give a statement to them?

A. For one, I don't like Eric Jackson.... And I figured that since they was sayin', you know as I took it, that nothin' would happen to me, that they just wanted Eric; that there wouldn't be no reason not to give 'em a statement about Eric. I wanted to see him get arrested.

(R. 314–15). Essentially, Whitfield could point to no specific direct or indirect promises. He simply stated that he believed that he wasn't going to get in trouble based on his belief that the police were only interested in Jackson. Even if comments were made regarding the police' heightened interest in Jackson, which both Detective Martin and Investigator Davis deny, such vague and indefinite statements by the police are not sufficient inducements to render a confession inadmissible. *See Neal v. State*, 522 N.E.2d 912 (Ind.1988) (police officer's comment that he could secure a minimum sentence if defendant "came clean" insufficient to render confession involuntary); *Ortiz v. State*, 265 Ind. 549, 356 N.E.2d 1188 (1976) (police officer's statement that he would "see what he could do" and "could possibly talk to the prosecu-

tor" insufficient to render confession involuntary).

After reviewing the circumstances surrounding the statement, we find no evidence aside from Whitfield's bare assertions that improper influences, threats, promises or coercion were used to obtain Whitfield's confession. Rather, we find that he voluntarily signed the waiver of rights form and voluntarily gave a taped confession of his involvement in the robbery. All of this was free from any threats or inducements. Whitfield's confession was voluntarily given and his motion to suppress was properly denied.

■ Whitfield also argues that the interrogating officers' failure to tape-record the entire interrogation process leading up to the confession violates his due process rights under Ind. Const. Art I, § 12. During the motion to suppress hearing, Detective Martin testified that there was an unrecorded preliminary interrogation just prior to the recorded interrogation that contained Whitfield's confession. Essentially, Whitfield urges this court to adopt persuasive precedent from other jurisdictions that institutes mandatory electronic recording to safeguard the voluntariness of confessions.[3] However, because this argument was raised for the first time on appeal, it will not be considered. *See Barker v. State*, 681 N.E.2d 727 (Ind.Ct. App.1997); *Goodner v. State*, 685 N.E.2d 1058 (Ind.1997) (An argument raised for the first time on appeal is waived and will not be considered by appellate court). Notwithstanding waiver, this issue has been decided in Indiana. *See Callis v. State*, 684 N.E.2d 233 (Ind.Ct.App.1997), *trans. denied* (the failure to tape record defendant's non-custodial post-polygraph interviews did not violate his due process rights under the Indiana Constitution); *Stoker v. State*, 692 N.E.2d 1386 (Ind.Ct.App.1998) (Article I, § 12 of the Indiana Constitution does not require law enforcement officers to record custodial interrogations in places of detention)[4].

---

3. *See Stephan v. State*, 711 P.2d 1156 (Alaska 1985); *Minnesota v. Scales*, 518 N.W.2d 587 (Minn.1994), *reh'g denied* (Both cases mandate the recording of custodial interrogations in places of detention. Alaska relied upon its state constitution, and Minnesota relied upon the

court's supervisory power "to insure the fair administration of justice.")

4. Although in *Stoker*, we held that our state constitution did not require the recording of custodial interrogations, we said the following in dicta:

Whitfield contends that the State failed to present sufficient evidence to support his conviction of robbery with a deadly weapon. Particularly, Whitfield argues that he was armed with a "toy gun." In fact, on the evening of the robbery, Whitfield wielded a pellet gun with the barrel drilled out.

Appellate review of a sufficiency of the evidence claim is well-established. We neither reweigh the evidence nor judge the credibility of the witnesses, as those matters are exclusively within the province of the jury. Rather, we consider only the evidence and inferences most favorable to the verdict and determine whether a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. If substantial evidence of probative value exists to support each element of the crime, we will not disturb the decision of the trial court. *Timberlake v. State*, 690 N.E.2d 243, 251 (Ind.1997), *reh'g denied*.

A person commits the crime of robbery when he "knowingly or intentionally takes property from another person or from the presence of another person: (1) by using or threatening the use of force on any person; or (2) by putting any person in fear." Ind. Code 35–42–5–1. The offense is a Class B felony if it is committed while armed with a deadly weapon. Ind.Code 35–42–5–1. A deadly weapon is defined in pertinent part as follows:

(1) a loaded or unloaded firearm.

(2) a weapon, devise, taser ... or electronic stun weapon ..., equipment, chemical substance, or other material that in the manner it is used, or could ordinarily be used, or is intended to be used, is readily capable of causing serious bodily injury.

Ind.Code 35–41–1–8(1)(2). "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes serious permanent disfigurement, unconsciousness, extreme pain, or permanent or protracted loss or impairment of the function of a bodily member or organ." Ind.Code 35–41–1–25.

Whether sufficient evidence exists to establish a weapon is deadly is determined by looking to whether the weapon had the actual ability to inflict serious injury under the fact situation and whether the defendant had the apparent ability to injure the victim seriously through use of the object during the crime. *Frey v. State*, 580 N.E.2d 362, 364 (Ind.Ct.App.1991), *trans. denied*. Whether a disabled pellet gun is a deadly weapon is an issue of first impression in Indiana. However, our courts have decided that a pellet gun is a deadly weapon and that a disabled firearm is a deadly weapon. *Williams v. State*, 451 N.E.2d 687 (Ind.Ct. App.1983) (jury could reasonably determine that pellet gun could cause serious bodily injury); *Barber v. State*, 418 N.E.2d 563 (Ind.Ct.App.1981) (revolver that fired only blanks is nonetheless readily capable of causing serious bodily injury because could be used as a bludgeoning device); *Rogers v. State*, 537 N.E.2d 481 (Ind.1989), *reh'g denied* (disabled .45 caliber automatic pistol was a deadly weapon within the meaning of Ind.Code 35–42–5–1).

We find *Rogers* particularly instructive because although the court acknowledged that the disabled pistol was not used in such a manner to cause serious bodily injury, it reasoned that because the gun was used in a threatening manner and caused the victims to fear for their lives, it was a deadly weapon. *Rogers*, 537 N.E.2d at 485. In the case at bar, the jury was instructed on the defini-

Nevertheless, although we impose no legal obligation, we discern few instances in which law enforcement officers would be justified in failing to record custodial interrogations in places of detention. Disputes regarding the circumstances of an interrogation would be minimized, in that a tape recording preserves undisturbed that which the mind may forget. In turn, the judiciary would be relieved of much of the burden of resolving disputes involving differing recollections of events which occurred. Moreover, the recording would serve to protect police officers against false allegations that a confession was not obtained voluntarily. Therefore, in light of the slight inconvenience and expense associated with the recording of custodial interrogations in their entirety, it is strongly recommended, as a matter of sound policy, that law enforcement officers adopt this procedure. 692 N.E.2d at 1390.

tion of "deadly weapon" and additionally, they were given the following instruction:

> The question of whether a weapon or device is a "deadly weapon" may be considered by you as a question of fact from any evidence describing the weapon or device, its realism, the manner of its use, the apparent ability to injure the victim seriously through use of the object during the crime, and all the circumstances of the case. A weapon need not be loaded or operable to meet the definition of a "deadly weapon."

(R. 175). One of the victims testified at trial that Whitfield came into the store, stuck a gun in his face and demanded money. The victim was so frightened that he could hardly speak. Furthermore, Investigator Davis testified that pellet guns are virtually indistinguishable from the real caliber guns that they are modeled after. (R. 610–611).

We conclude that under the specific facts of this case, the disabled pellet gun was used in a threatening manner and placed the victims in fear and hence was a deadly weapon within the meaning of Ind.Code 35–42–5–1 and Ind.Code 35–41–1–8.

## CONCLUSION

The trial court did not err in denying Whitfield's motion to suppress his confession as his statements were freely and voluntarily given after a signed waiver was obtained. Furthermore, the evidence was sufficient to support Whitfield's conviction of robbery with a deadly weapon.

Affirmed.

NAJAM and BAILEY, JJ., concur.