# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 28 2016, 6:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Karl Scharnberg
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Rodney Lloyd,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 28, 2016<br><br>Court of Appeals Case No.<br>79A02-1509-CR-1465<br><br>Appeal from the Tippecanoe<br>Superior Court 1<br><br>The Honorable Randy J. Williams,<br>Judge<br><br>Trial Court Cause No.<br>79D01-1410-F3-00006 |

**Mathias, Judge.**

[1] Following a jury trial in Tippecanoe Superior Court, Rodney Lloyd ("Lloyd") was convicted of Level 3 felony robbery while armed with a deadly weapon and

sentenced to nine and one-half years of incarceration. Lloyd appeals and presents two issues, which we restate as: (1) whether the State presented evidence sufficient to prove that Lloyd was armed with a deadly weapon, and (2) whether Lloyd's nine and one-half year sentence is inappropriate.

We affirm.

## Facts and Procedural History

At the time relevant to this appeal, Yeuping Zhang ("Zhang") was a graduate student at Purdue University. Zhang looked on a website where he could find an escort or prostitute. He decided to call upon the services of Larissa Catron ("Catron"), who went by the name of "Aria" on the website. Tr. p. 61. Zhang telephoned Catron and agreed to meet her on October 19, 2014, and pay her $100 for an hour of her time.

Catron lived in a duplex with Quenton Hansen ("Hansen"). Before Zhang came to her house, Catron sent a text message to Lloyd to see if she wanted to "hit a lick"[1] with her and Hansen. Tr. p. 85. Lloyd agreed and asked to bring another individual, who was variously identified as either his younger cousin or younger brother. When Catron objected to the inclusion of this younger person, Lloyd reassured her that he was eighteen years old and that he and his younger relative were "good at hitting licks." Tr. p. 87.

---

[1] "Hit a lick" is street slang for an easy means of obtaining money, often through illegal means. *See* Tr. p. 85.

[5] Lloyd and his relative arrived at Catron's home, where they, Catron, and Hansen smoked marijuana. Catron also injected herself with heroin. Before Zhang arrived at 5:00 p.m., Hansen hid in the bathroom with Catron's dog, while Lloyd and his relative hid in a closet in the bedroom. When Zhang arrived, Catron took him to her bedroom and demanded payment in cash up front. Zhang handed her five $20 bills, which Catron placed in a hutch in the hallway.

[6] Catron then returned to the bedroom and demanded that Zhang leave her home. Zhang objected that he had not received anything in exchange for his money and demanded his money back. Catron told Zhang that she was not alone and that he needed to leave. At this point, Lloyd and his relative burst out of the closet, and Hansen came out of the bathroom into the bedroom. Lloyd placed what appeared to be a handgun to Zhang's head. Lloyd and his relative pushed Zhang face-first against the wall and told Zhang, "Don't move. Do you want to die?" Tr. p. 40. They then frisked Zhang and took another $100 in cash, his cell phone, and his car keys.

[7] Lloyd handed the gun to his relative, who continued to hold it against Zhang's head. Lloyd took the car keys and went to Zhang's car, where he found Zhang's wallet and stole another $40 or $50 in cash. Lloyd then returned to Catron's home and gave the keys back to Zhang. One of the robbers gave Zhang his cell phone. Catron held up her cell phone and falsely told Zhang that she had recorded the entire incident and, if he went to the police, she would show them the recording as proof that he was illegally visiting a prostitute. They then

shoved Zhang out the front door. As he left, Zhang heard the robbers laughing at their successful crime.

[8]     Undeterred by Catron's threat, Zhang contacted the police and reported the robbery. The police obtained a warrant to search Catron's home, and, during the execution of the warrant, found the $100 Catron had placed in the hutch and a BB gun that looked like a handgun underneath Catron's mattress. Lloyd and the others were arrested. When questioned by the police, Lloyd admitted that he had hidden in the closet but claimed that his relative had perpetrated the robbery.

[9]     On October 24, 2014, the State charged Lloyd with Level 3 felony conspiracy to commit robbery while armed with a deadly weapon, Level 3 felony robbery while armed with a deadly weapon, Level 3 felony conspiracy to commit criminal confinement, Level 3 felony criminal confinement, and Class A misdemeanor theft. The State subsequently dismissed the conspiracy counts. A two-day jury trial commenced on July 21, 2015, at the conclusion of which the jury found Lloyd guilty of the remaining charges. The trial court "merged" the theft and confinement convictions with the robbery conviction and entered judgment only on the robbery conviction. On September 8, 2015, the trial court sentenced Lloyd to nine and one-half years of incarceration. Lloyd now appeals.

# I. Sufficiency of the Evidence

Lloyd first argues that the State failed to present evidence sufficient to support his conviction for Level 3 felony robbery while armed with a deadly weapon. Specifically, Lloyd claims that the State failed to prove that he was armed with a deadly weapon because the weapon used was a BB gun and not a firearm.

In reviewing this claim, we apply our well-settled standard of review. We neither reweigh the evidence nor judge the credibility of the witnesses, and we consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn from this evidence. *Knight v. State*, 42 N.E.3d 990, 993 (Ind. Ct. App. 2015). We will not disturb the jury's verdict if substantial evidence of probative value supports it. *Id*. As an appellate court, we respect the jury's exclusive province to weigh conflicting evidence. *Id*.

The State charged Lloyd with Level 3 felony robbery while armed with a deadly weapon. The statute defining this crime provides:

> A person who knowingly or intentionally takes property from another person or from the presence of another person:
>
>> (1) by using or threatening the use of force on any person; or
>>
>> (2) by putting any person in fear;
>
> commits robbery, a Level 5 felony.
>
> However, the offense is a Level 3 felony *if it is committed while armed with a deadly weapon* or results in bodily injury to any person other than a defendant.

Ind. Code § 35-42-5-1 (emphasis added). Lloyd argues only that the State failed to prove that the BB gun used during the robbery was a deadly weapon, which elevated his crime from a Level 5 felony to a Level 3 felony.

[13]     The statute defining the term "deadly weapon" provides in relevant part:

> (a) Except as provided in subsection (b),[2] "deadly weapon" means the following:
>
>> (1) A loaded or unloaded firearm.
>>
>> (2) A destructive device, weapon, device, taser (as defined in IC 35-47-8-3) or electronic stun weapon (as defined in IC 35-47-8-1), equipment, chemical substance, or other material that in the manner it:
>>
>>> (A) is used;
>>>
>>> (B) could ordinarily be used; or
>>>
>>> (C) is intended to be used;
>>
>> is readily capable of causing serious bodily injury.
>>
>> (3) An animal (as defined in IC 35-46-3-3) that is:
>>
>>> (A) readily capable of causing serious bodily injury; and

---

[2] Subsection 86(b), which is inapplicable here, provides:

> (b) The term [deadly weapon] does not include:
>     (1) a taser (as defined in IC 35-47-8-3);
>     (2) an electronic stun weapon (as defined in IC 35-47-8-1);
>     (3) a chemical designed to temporarily incapacitate a person; or
>     (4) another device designed to temporarily incapacitate a person;
> if the device described in subdivisions (1) through (4) is used by a law enforcement officer who has been trained in the use of the device and who uses the device in accordance with the law enforcement officer's training and while lawfully engaged in the execution of official duties.

(B) used in the commission or attempted commission of a crime.

(4) A biological disease, virus, or organism that is capable of causing serious bodily injury.

Ind. Code § 35-31.5-2-86.

[14] Lloyd spends much of his brief arguing that a BB gun is not a firearm.[3] However, a BB gun may still be considered a deadly weapon if, in the manner it is used, could ordinarily be used, or is intended to be used, is readily capable of causing serious bodily injury. *See* I.C. § 35-31.5-2-86(a)(2). "Serious bodily injury" is in turn defined as "bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus." Ind. Code § 35-31.5-2-292.

[15] The question of whether a weapon is a deadly weapon is determined from a description of the weapon, the manner of its use, and the circumstances of the case. *Merriweather v. State*, 778 N.E.2d 449, 457 (Ind. Ct. App. 2002) (citing *Glover v. State*, 441 N.E.2d 1360, 1362 (Ind. 1982)). The jury, when determining whether a weapon is a "deadly weapon" for purposes of the statute, "may look

---

[3] A "firearm" is statutorily defined as any weapon that is capable of expelling, designed to expel, or that may readily be converted to expel, a projectile by means of an explosion. Ind. Code § 35-47-1-5. This court has previously held that a BB gun or pellet gun is not a firearm. *See Miller v. State*, 616 N.E.2d 750, 757 n.13 (Ind. Ct. App. 1993) (holding that a pellet gun cannot be considered a "handgun" because it uses carbon dioxide as the propellant, which cannot explode); *but see id.* at 758 (Rucker, J., dissenting in relevant part) (concluding that a pellet gun using carbon dioxide gas did fit the statutory definition of a "firearm" because it expelled a projectile by way of an explosion, i.e., "sudden violence from internal energy caused by the pressure from CO2 gas.").

to whether the weapon had the actual ability to inflict serious injury under the fact situation and whether the defendant had the *apparent* ability to injure the victim seriously through use of the object during the crime." *Id*. (emphasis supplied) (citing *Whitfield v. State*, 699 N.E.2d 666, 670 (Ind. Ct. App. 1998)).

[16] Against this background, Lloyd's claim that the BB gun used to rob Zhang was not a deadly weapon is completely without merit. Our courts have held for over thirty years that a BB gun, even though not a firearm, can still be considered a deadly weapon. *See Glover*, 441 N.E.2d at 1362; *Davis v. State*, 835 N.E.2d 1102, 1112 (Ind. Ct. App. 2005); *Merriweather v. State*, 778 N.E.2d 449, 457 (Ind. Ct. App. 2002); *Whitfield v. State*, 699 N.E.2d 666, 670 (Ind. Ct. App. 1998); *Hart v. State*, 671 N.E.2d 420, 428 (Ind. Ct. App. 1996) (all holding that a BB gun was a deadly weapon).[4]

[17] The same is true here. The BB gun used by Lloyd looks like a firearm. *See* Ex. Vol., State's Exs. 16, 17. It was used in a manner intended to make Zhang believe that it was a real firearm, and it was intended, and did, place Zhang in fear. *See* Tr. p. 43. Although no direct testimony was presented regarding the ability of the BB gun to cause injury, we think it was well within the knowledge of the jury that a BB gun can cause injury, either by shooting a BB or pellet or by being used as a blunt-force weapon. Indeed, even Lloyd admits that the BB gun, had it been fired, might have pierced Zhang's scalp.

---

[4] *Hart* was abrogated in part on other grounds by *Fajardo v. State*, 859 N.E.2d 1201 (Ind. 2007). *Fajardo* was itself later superseded by statute, as noted in *Abernathy v. Gulden*, 46 N.E.3d 489, 496 (Ind. Ct. App. 2015).

From this evidence, the jury was well within its role as the trier of fact to determine that the BB gun used by Lloyd was a deadly weapon for purposes of elevating Lloyd's crime to a Level 3 felony. *See Rogers v. State*, 537 N.E.2d 481, 485 (Ind. 1989) (holding that the realism of the weapon used, even though it was disabled, coupled with defendant's threatening behavior, caused the victims to fear for their lives and was therefore a "deadly weapon"); *Glover*, 441 N.E.2d at 1362 (holding that jury could reasonably find that .177 caliber air pistol was a deadly weapon where the pistol, "when discharged at a human being at close range, could result in extreme pain, and even the loss and impairment of hearing or sight."); *Davis,* 835 N.E.2d at 1112-13 (holding that evidence was sufficient to support jury finding that BB guns used in bank robbery were deadly weapons where the victims and even the police, at least initially, believed that the guns were real firearms, the robbers used the guns in a threatening manner, and there was evidence that the BB guns could cause serious bodily injury); *Merriweather,* 778 N.E.2d at 458 (holding that evidence was sufficient to support finding that BB gun was a deadly weapon where the gun used had the apparent ability to cause serious bodily injury and was used in a threatening manner and placed the victims in fear); *Whitfield*, 699 N.E.2d at 671 (holding that evidence was sufficient to support finding that disabled pellet gun was a deadly weapon where defendant came into a store, stuck a gun in the victim's face and demanded money, the victim was so frightened that he could barely speak, and the pellet gun was "virtually indistinguishable" from a real caliber gun); *Hart*, 671 N.E.2d at 428 (holding that jury could have properly found that the BB gun used was a deadly

weapon where the BB gun itself was introduced into evidence, and the victim testified that the weapon pointed at him placed him in fear for his life).

[19] We therefore conclude that the evidence was sufficient to support the jury's conclusion that the BB gun used by Lloyd was a deadly weapon sufficient to elevate Lloyd's conviction for robbery to a Level 3 felony.

## II. Inappropriate Sentence

[20] Lloyd also claims that his nine and one-half year sentence is inappropriate in light of the nature of the offense and the character of the offender. Even if a trial court acts within its lawful discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of that sentence. *Trainor v. State*, 950 N.E.2d 352, 355-56 (Ind. Ct. App. 2011). This authority is implemented via Indiana Appellate Rule 7(B), which provides that an appellate court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." However, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Id*. at 355-56.

[21] Although we have the power to review and revise sentences, "[the principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of

the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Fernbach v. State*, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011) (citing *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)). The burden is on the defendant to persuade us that his sentence is inappropriate. *Trainor*, 950 N.E.2d at 356 (citing *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007)).

[22] Here, Lloyd was convicted of a Level 3 felony. The sentencing range for a Level 3 felony is three to sixteen years, with the advisory sentence being nine years. Ind. Code § 35-50-2-5(b). Thus, the nine and one-half year sentence imposed by the trial court was only slightly above the advisory sentence, and well below the maximum sentence. With this in mind, we address Lloyd's claim that his sentence is inappropriate.

[23] Considering the nature of the offense, we note that Lloyd lay in wait for Zhang by hiding in the closet. Lloyd played the central role in the armed robbery and was the one who pointed the gun at Zhang's head and asked him if he "wanted to die?" Tr. pp. 40-41. Lloyd took Zhang's car keys and stole items from the vehicle. Lloyd also involved his younger relative in the robbery. Thus, the nature of the offense does nothing the persuade us that the sentence imposed by the trial court was inappropriate.

[24] Lloyd's character also provides no support for his claim that his sentence is inappropriate. Lloyd has a history of delinquent and criminal behavior that dates back to 2009, when he was adjudicated a delinquent child for actions that, if committed by an adult, would have been Class C felony burglary, Class A

misdemeanor resisting law enforcement, and Class B misdemeanor false informing. During the juvenile case, Lloyd failed to appear twice and failed to report to probation.

[25] In 2012, Lloyd was convicted as an adult of Class A misdemeanor criminal trespass and was sentenced to a ninety-day suspended term and ordered to complete 275 days of unsupervised probation. Lloyd failed to appear on two occasions during that case and had his probation revoked. In 2013, Lloyd was convicted of Class D felony theft and Class A misdemeanor carrying a handgun without a license. Lloyd was still on probation from this offense at the time he committed the instant offenses. In 2014, Lloyd was convicted of Class B misdemeanor false informing. Lloyd was also on probation for this offense when he committed the instant offenses.

[26] Lloyd has a significant criminal history that includes carrying a handgun without a license. He was also granted probation in the past to no effect and was even on probation in two different cases at the time of the instant offenses. Prior attempts at leniency have obviously failed to correct Lloyd's criminal behavior. Giving due deference to the trial court's sentencing decision, we are unable to say that Lloyd has demonstrated that his nine and one-half year sentence is inappropriate in light of the nature of his offense and the character of the offender.

[27] Affirmed.

Vaidik, C.J., and Barnes, J., concur.