# FOR PUBLICATION



FILED
Oct 09 2012, 9:00 am

CLERK
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE:

**PAUL R. SEMENICK**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JOSEPH Y. HO**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| PAUL R. SEMENICK, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No.  49A02-1111-CR-1035 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable William J. Nelson, Judge
Cause No. 49F07-1009-CM-69436

**October 9, 2012**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

Paul R. Semenick ("Semenick"), a long-term member of Lakeview Christian Church ("Lakeview"), appeals his conviction for Criminal Trespass, as a Class A misdemeanor,[1] arising out of his attendance at Sunday morning services. Semenick challenges the sufficiency of the evidence to support the conviction.[2] We reverse.

## Facts and Procedural History

On September 5, 2010, certain worshippers at Lakeview sought to impose their will over another similarly situated worshipper during Sunday morning services. One parishioner sought to engage the authority of the State to intervene in a private disagreement over the degree of reverence for the church sanctuary, and this ultimately led to a criminal conviction and order to stay off Lakeview property. We do not "take it on faith" that the off-duty police officer, acting as a security guard, had unfettered discretion to take sides and remove one worshipper at the behest of another.

On September 5, 2010, Semenick attended a Sunday morning worship service at Lakeview. During the musical portion of the service, Semenick approached Manuel Halbert ("Halbert"), a volunteer greeter, to complain that Halbert was speaking too loudly with Sheriff's Deputy Jennifer Crittendon ("Deputy Crittendon"). Deputy Crittendon then moved

---

[1] Ind. Code § 35-43-2-2.

[2] In light of our disposition for insufficiency of the evidence, we need not address Semenick's contention that he could not be prosecuted under the Criminal Trespass statute because he was exercising his First Amendment right to worship. Semenick neither moved to dismiss the charge on this basis nor raised any constitutional issue in the trial court. Nonetheless, it is readily apparent that fundamental rights are implicated, including freedom of worship and freedom of assembly.

out of the sanctuary, and Halbert began to speak with James Martin ("Martin").

Semenick left the sanctuary to seek the assistance of Donald Henry ("Henry"), the head volunteer greeter. Semenick requested that Henry direct Halbert and Martin to be quiet or continue their conversation outside the sanctuary. Henry responded that Halbert needed to welcome people, as "that's his job." (Tr. 72.) Martin nonetheless decided to apologize to Semenick. He approached Semenick by placing a hand on his shoulder. Semenick ordered Martin "get your hand off me" and Henry asked both men to sit down.[3] (Tr. 72.) They complied.

Yet, Halbert left the sanctuary to seek assistance from security officers who were at the main entrance of the Lakeview parking lot. He located Sergeant John Dierdorf ("Sergeant Dierdorf"), an off-duty Town of Cleremont police officer who provided services to Lakeview on a call-in basis and would "usually roam the parking lot in [his] car."[4] (Tr. 100.) And although Semenick was seated and participating in the service, Sergeant Dierdorf entered the sanctuary and asked Semenick to leave. Semenick initially refused to leave but, upon threat of forcible removal, moved into the main hallway. Sergeant Dierdorf directed Semenick to exit the door to his right.

---

[3] The dissent characterizes Semenick's tone as yelling, but we do not feel it appropriate to over-dramatize the verbal discord, given that there was conflicting evidence as to any level of disruption. For example, Henry testified that Semenick had only been "a little loud" when asking Martin to remove his hand from Semenick's shoulder and, as far as Henry was concerned, "the worship service was not interrupted, disrupted, stopped, [or] altered." (Tr. 76-77.) Indeed, the jury acquitted Semenick of Disorderly Conduct and the evidence most favorable to this verdict of acquittal suggests only that a minor incident had ensued.

[4] It is unclear from the record whether Sergeant Dierdorf also attended services at Lakeview, as he testified that he prefers to attend church rather than police the parking lot. In addition, he was dating, and later married, Deputy Crittendon.

3

In the hallway, Semenick approached Henry although Sergeant Dierdorf twice more insisted that Semenick leave. Semenick told Henry "you need to tell your rent-a-cops they can't do nothing to me." (Tr. 104-5.) Henry responded, "these officers are here by church's orders … they do traffic and everything else." (Tr. 73.) According to Henry, "[Semenick] kept on ranting" and Sergeant Dierdorf responded, "I'll show you what a rent-a-cop can do." (Tr. 73.) Semenick was arrested and charged with Criminal Trespass and Disorderly Conduct.

Semenick was tried before a jury on October 25, 2011. Prior to the presentation of evidence, the trial court, without opposition from the State,[5] quashed subpoenas that had been issued to a Lakeview senior pastor and another individual whose position was not specified. At the conclusion of the trial, Semenick was acquitted of Disorderly Conduct but convicted of Criminal Trespass. The trial court sentenced Semenick to 365 days imprisonment, suspended 363 days, and ordered him to stay away from Lakeview (absent an invitation of fellowship from the church). This appeal ensued.

### Discussion and Decision

When the sufficiency of the evidence to support a conviction is challenged, we neither reweigh the evidence nor judge the credibility of the witnesses, and we affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. Wright v. State, 828 N.E.2d 904, 905-06 (Ind. 2005).

---

[5] Upon questioning from the trial court, the prosecutor indicated that one of the individuals subject to the subpoenas lacked "personal information regarding the facts of the case." (Tr. 10.)

Pursuant to Indiana Code section 35-43-2-2(a)(2), one commits the offense of Criminal Trespass when he "not having a contractual interest in the property, knowingly or intentionally refuses to leave the real property of another person after having been asked to leave by the other person or that person's agent." "The criminal trespass statute's purpose is to punish those who willfully or without a bona fide claim of right commit acts of trespass on the land of another." Woods v. State, 703 N.E.2d 1115, 1117 (Ind. Ct. App. 1998) (citing Myers v. State, 190 Ind. 269, 273, 130 N.E. 116, 117 (1921)). The State must prove every element of the crime charged beyond a reasonable doubt. In re Winship, 397 U.S. 358, 361 (1970).

"Contractual interest," as that phrase is used in the criminal trespass statute, refers to the right to be present on another's property, arising out of an agreement between at least two parties that creates an obligation to do or not to do a particular thing. Taylor v. State, 836 N.E.2d 1024, 1026 (Ind. Ct. App. 2005), trans. denied. "[T]he State need not 'disprove every conceivable contractual interest' that a defendant might have obtained in the real property at issue." Lyles v. State, 970 N.E.2d 140, 143 (Ind. 2012) (quoting Fleck v. State, 508 N.E.2d 539, 541 (Ind. 1987)). "[T]he State satisfies its burden when it disproves those contractual interests that are reasonably apparent from the context and circumstances under which the trespass is alleged to have occurred." Id.

In Lyles, the State disproved the defendant's contractual interest where there was evidence that the "irate and disrespectful" defendant was neither an owner nor an employee of the bank, as well as evidence that the bank manager had authority to ask customers to

5

leave the bank premises. Id. at 142. Here, there is uncontroverted testimony that Semenick was a church member, and an absence of evidence that Sergeant Dierdorf had authority to demand, without more, that a worshipper leave the sanctuary during Sunday services. Effectively, he intervened between parishioners who presumably had equal interests in the premises, and chose who would stay and who would go.

Semenick was not a stranger in the midst of the church, but was rather a longtime contributor, participant, and believer. He had attended Lakeview services on a regular basis for twenty-two to twenty-three years. He had enrolled his children in Lakeview's elementary school for several years. He had "prayed for people that [he] thought needed it and they've prayed for [him]." (Tr. 131.) He considered himself to be a member of Lakeview, testifying that Lakeview did not have a formal procedure for attaining membership.

Moreover, Semenick's membership was not challenged by the State in the trial court. There was no testimony from a pastor or member of the Lakeview governing board that Semenick had failed to comply with a membership requirement or was not a member. Thus, the evidence indicates only that Semenick was a church member having a right to be present at a church service on church property "arising out of an agreement."[6] Id.

---

[6] The dissent has expressed the view that the majority "wholly credits Mr. Semenick's self-serving testimony." Slip op. at 8. Indeed, Semenick's testimony in regard to his Church membership may be self-serving, but it is the sole testimony offered regarding Semenick's interest in being on Church premises. We could speculate that – had the trial court not quashed the subpoenas of Church leaders Semenick had sought to offer as witnesses – testimony might have been presented by a pastor or Church employee regarding Semenick's lack of contractual interest. However, with full acquiescence of the State, such testimony was not offered. Where no evidence is offered by the State on an essential element of a charged crime, we cannot draw inferences favorable to the State from non-existent evidence. We will affirm a conviction only if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. Wright, 828 N.E.2d at 906 (emphasis added).

6

Persons having the same interest in being present on the premises disagreed regarding the reverence to be afforded the sanctuary of the church. One parishioner insisted upon involving the Sunday morning parking lot patrol. Although the record suggests that Sergeant Dierdorf performed services for Lakeview as an independent contractor, there was no testimony from a pastor, governing board member or employee that Sergeant Dierdorf had the authority, without more, to take sides and ask a parishioner to leave, let alone threaten to forcibly remove a member from the sanctuary, during Sunday morning services. Lyles is distinguishable on this basis. Even more compelling, a bank is a commercial setting and we should be ever more diligent to hold the State to its burden of proof where such fundamental rights of assembly and worship are implicated.

Clearly, one having a contractual interest in being on property is nevertheless not entitled to make unreasonable noise or disrupt services. See Woods, 703 N.E.2d at 1118 ("Woods' membership did not entitle her to make unreasonable noise and disrupt Bally's facility in demanding the return of her membership card"). See also A.E.B. v. State, 756 N.E.2d 536, 540 (Ind. Ct. App. 2001) (concluding that a student "violated whatever contract existed when she interfered with the educational activities at Coleman Middle School to the point where she committed the crime of disorderly conduct."). Nonetheless, although Semenick's words and conduct were arguably unfriendly, it was his prerogative to verbally rebuff an unwanted touching and to seek out a volunteer coordinator to resolve a noise complaint. One could argue that Halbert's boisterousness and gregariousness constituted unreasonable noise and it was certainly disruptive to at least one other worshipper.

7

Regardless, the church service continued uninterrupted. Indeed, the jury acquitted Semenick of Disorderly Conduct. In short, there is evidence of unpleasant demeanor by several in attendance on that fateful morning but an unpleasant demeanor does not always equate to criminality.[7]

The evidence does not establish that Sergeant Dierdorf was given the authority to remove someone from the church sanctuary. In fact, the only authority given to Sergeant Dierdorf that is in the record is that he was to direct traffic and see that no one "messed" with the cars—none of which is relevant to the issues herein. Accordingly, there is insufficient evidence to persuade a reasonable fact-finder that Sergeant Dierdorf acted as Lakeview's agent when he removed Semenick. Indeed, by Sergeant Dierdorf's own account, he typically patrolled the parking lot and had not made a prior arrest in the church sanctuary. Distressingly, the instant arrest appears to have neatly coincided with Semenick's rude and repetitious use of the phrase "rent-a-cop." Without testimony from a church official disavowing Semenick's contractual interest and otherwise clearly delineating the limits of a

---

[7] The State did not confine itself to the presentation of relevant evidence, that is, evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ind. Evidence Rule 401. Rather, the prosecutor improperly suggested that Semenick was dangerous, in a manner designed to inflame the passions of the jury. The prosecutor inquired of Semenick whether he had a lawsuit against the City of Indianapolis. Semenick conceded that he had filed a lawsuit, but explained it was "unrelated" to the criminal charges against him. (Tr. 149.) Undeterred, the prosecutor asked, "So were you concerned when they found all the weapons in your car?" (Tr. 151.) Semenick was then obliged to explain that the rifles were part of his gun collection, all were unloaded, and they were locked in his trunk so that his son (convicted of credit card fraud at age 18) would not have access to any weapon in violation of the law. The prosecutor advised the trial court, upon inquiry, that Semenick had not been charged with any weapons violation. Nonetheless, the damage was done. Semenick, who had a Second Amendment right to lawfully bear arms, was portrayed – by the misconduct of the prosecutor intent upon introducing extraneous and inflammatory material – as a threatening individual in the midst of the Church. The dissent exacerbates the harm ensuing from the improper line of questioning by suggesting that unlawful conduct was afoot because Semenick's locked vehicle contained unloaded rifles.

8

member's contractual interests and the breadth of an occasional part-time contract employee's authority, the State failed in its burden to prove material elements of Criminal Trespass within the meaning of Indiana Code Section 35-43-2-2(a)(2).  Accordingly, there is insufficient evidence to sustain Semenick's conviction.

Reversed.

ROBB, C.J., concurs.

MATHIAS, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

PAUL R. SEMENICK,           )
                                        )
    Appellant-Defendant,    )
                                        )
        vs.                     )     No. 49A02-1111-CR-1035
                                        )
STATE OF INDIANA,        )
                                        )
    Appellee-Plaintiff.    )

**MATHIAS, Judge dissenting**

I respectfully dissent.

I believe that we are constrained to affirm the jury verdict in this case under our standard of review and because of the unique location in which Mr. Semenick's disruptive behavior took place.

Mr. Semenick's appeal is from a jury verdict. Our standard of review regarding a jury verdict requires us to consider only the facts most favorable to that verdict, along with any reasonable inference that the jury could have drawn from those facts. McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005). We must respect the jury's exclusive province to weigh conflicting evidence, and we should therefore neither reweigh the evidence nor judge witness

10

credibility.  Id.  We must also recognize the province of the jury to disregard undisputed testimony.  Griffin v. State, 493 N.E.2d 439, 443 (Ind. 1986); Morphew v. Morphew, 419 N.E.2d 770, 777 (Ind. Ct. App. 1981).  What follows are the facts that I believe support the jury's verdict.

On the morning in question, Manual Halbert ("Halbert"), who is a retired Special Deputy Sheriff for the Indianapolis Department of Public Works and uses a wheelchair as a result of his diabetes, was serving as a volunteer greeter at Lakeview Christian Church in Indianapolis ("the Church").  When Mr. Semenick entered the Church that morning, Halbert greeted him but received no response.  As the services began, Halbert moved inside the entrance to the sanctuary, which seats approximately 2,000, to greet those who entered the sanctuary.  Halbert began to speak with Jennifer Crittendon ("Crittendon"), a Deputy Sheriff employed by the Church to provide security for the Church during services.  Shortly thereafter, Mr. Semenick, who was seated nearby in the back of the sanctuary, approached Halbert and Crittendon and told them to "shut up."  Tr. p. 26.  Crittendon then left the sanctuary area, and Halbert began to speak with another churchgoer, James Martin ("Martin").  Mr. Semenick turned around in his seat, glared at Halbert and Martin and told them that they were "making too much noise."  Tr. pp. 26-27.

Mr. Semenick then left his seat in the sanctuary to look for Don Henry ("Henry"), who was the head usher and supervisor of the door greeters, to complain about people making too much noise.  Henry assumed Mr. Semenick was complaining about other parishioners, but when he went with Mr. Semenick into the sanctuary, Mr. Semenick pointed at Halbert and

11

Martin and stated, "these guys need to shut up." Tr. p. 60. Henry informed Mr. Semenick that Halbert was one of the greeters and that it was his job to welcome people to the Church. He also told Mr. Semenick that he would hear the door greeters if he sat in the back of the Church. Martin attempted to apologize for disturbing Mr. Semenick, and extended his hand toward Mr. Semenick. This caused Mr. Semenick to yell or shout[8] at Martin, "don't touch me," and "get your hand off me." Tr. pp. 38, 72. Martin had "never seen that much anger in one person," and was of the opinion that Mr. Semenick "created . . . a clear and present danger." Tr. p. 60. Mr. Semenick's loud voice caused several people in the front of the sanctuary to turn around and look back.

Concerned that Mr. Semenick was causing or about to cause a disturbance in the sanctuary, Halbert left the sanctuary and flagged down Sergeant John Dierdorf ("Sgt. Dierdorf") of the Town of Clermont Police Department, who worked as a security guard for the Church. Sgt. Dierdorf was in full uniform and was at that time speaking with Officer Kevin Brown ("Officer Brown") of the Indianapolis Metropolitan Police Department. Halbert informed Sgt. Dierdorf of Mr. Semenick's behavior. Sgt. Dierdorf stated that Halbert was extremely upset and "almost in tears," which was uncharacteristic for Halbert. Tr. p. 102.

---

[8] The majority takes issue with the characterization of Mr. Semenick's behavior as "yelling," choosing to characterize the words he used as an order, rather than characterizing the level or tone of voice that he used, as well. Witness Manuel Halbert agreed with the term, "yell," and witness Donald Henry testified that he only heard Mr. Semenick "yell or shout" when he "told James [Martin] to get his hands off of him." See Tr. pp. 42-43, 77. The majority claims that characterizing Mr. Semenick's behavior as a yell or a shout "over-dramatiz[es]" Mr. Semenick's behavior "given that there was conflicting evidence as to any level of disruption." Slip op., supra, p. 3. I disagree. There is conflicting evidence in every trial, and it was the sole province of the jury to weigh any conflicting testimony. McHenry, 820 N.E.2d at 126. On appeal, our role is to consider only the evidence that favors the jury's verdict. Id.

12

Sgt. Dierdorf then followed Halbert back into the sanctuary. As Halbert was informing him of what had happened, but before he had pointed to Mr. Semenick as the person involved, Sgt. Dierdorf noticed Mr. Semenick "fidgeting in his seat, looking behind him . . . in an agitated mode," as if "he was angry at whatever noise was going on around him." Tr. pp. 103, 110. Sgt. Dierdorf wanted to "deescalate the situation" and approached Mr. Semenick in his seat and asked him to gather his belongings and step outside the sanctuary with Sgt. Dierdorf. Tr. p. 103. Mr. Semenick asked if he was under arrest, and when told that he was not, he refused to leave the sanctuary. Sgt. Dierdorf then informed Mr. Semenick that he had to leave the sanctuary on his own or Sgt. Dierdorf would "help him stand up and make him leave." Tr. p. 104. Mr. Semenick then left the sanctuary with Sgt. Dierdorf.

As he escorted Mr. Semenick out of the sanctuary and into the lobby, Sgt. Dierdorf told Mr. Semenick he needed to leave the Church. Instead of directly leaving the Church, Mr. Semenick approached Henry, who was also in the Church lobby at this time, and told him to "explain to these cops . . . what was going on." Tr. p. 73. Henry again told Mr. Semenick that the door greeters had to welcome people and that Mr. Semenick would hear them talking from where he was seated. Mr. Semenick asked Henry, "what are these rent-a cops doing here?" Tr. p. 73. Henry informed him that the police were there "by church's orders." Id. Mr. Semenick then stated that the officers, whom he again referred to as "rent-a-cops," could not do anything to him. At this point Mr. Semenick was again being loud,

13

causing people in a nearby café area of the church to stop and look at the disturbance. Sgt.

Dierdorf then placed Mr. Semenick in handcuffs and took him outside the Church.[9]

## Discussion and Decision

To me, the resolution of this case is dictated by our well-settled standard of review.

When reviewing a claim of insufficient evidence, in the case of a jury verdict, we consider

only the facts most favorable to that verdict, along with any reasonable inference that the jury

could have drawn from those facts. McHenry, 820 N.E.2d at 126. Respecting the jury's

exclusive province to weigh conflicting evidence, we neither reweigh the evidence nor judge

witness credibility. Id. We must affirm the jury's verdict if the probative evidence and

reasonable inferences drawn from the evidence could have allowed a jury to find the

defendant guilty beyond a reasonable doubt. Id.

In Lyles v. State, our supreme court summarized the elements of criminal trespass as

follows:

> "[T]he State must prove that the defendant (1) knowingly or intentionally (2) refused to leave (3) the real property (4) of another person (5) after having been asked to leave (6) by the person or the person's agent (7) when such defendant lacked a contractual interest in the real property."

970 N.E.2d 140, 142-43 (Ind. 2012) (citing Ind. Code § 35-43-2-2(a)(2)).

Applying our standard of review, I conclude that the State presented sufficient

evidence from which the jury could reasonable conclude that Mr. Semenick, not having a

contractual interest in the property at issue, knowingly or intentionally refused to leave the

real property of the Church after having been asked to leave by an agent of the Church.

---

[9] A subsequent inventory search of Mr. Semenick's car revealed several rifles.

14

A. *Agent of the Church*

First, I believe that the State presented sufficient evidence to prove that Mr. Semenick was asked to leave by the Church or an agent of the Church. Although "the property owner" did not testify, the State did present evidence that Sgt. Dierdorf was hired by the Church and was under the orders of the Church to act as a security officer. The majority claims that Sgt. Dierdorf was given authority only to patrol the parking lot. It is true that Sgt. Dierdorf testified that he was patrolling the parking lot when he was called into the church to deal with the escalating situation involving Mr. Semenick. But he also testified that although he was typically outside during the first service, he would be inside the Church building during the second service. Thus, it is apparent that his authority extended beyond simply patrolling the parking lot and including acting as a security officer inside the Church building itself.

I think the jury could reasonably conclude that part of Sgt. Dierdorf's powers as a security officer was to ask anyone causing a disturbance to leave the Church premises. Indeed, Sgt. Dierdorf would be a distinctly ineffectual security officer if he were without authority to ask those causing a disturbance to leave the Church. In fact, Mr. Semenick's own reference to Sgt. Dierdorf as a "rent-a-cop" strongly suggests that Mr. Semenick himself understood that Sgt. Dierdorf was hired by the Church to act as a security officer.

I find Mr. Semenick's citation to Glispie v. State, 955 N.E.2d 819 (Ind. Ct. App. 2011), unavailing. In that case, this court held that the testimony of a police officer that he could act as an agent of the property owner was insufficient to establish that the officer was in fact such an agent because "[i]t is a well-established rule that agency cannot be proven by

15

the declaration of the agent alone." Id. at 822 (citing United Artists Theatre Circuit, Inc. v. Ind. Dep't of State Revenue, 459 N.E.2d 754, 758 (Ind. Ct. App. 1984)). In Glispie, the State offered no other evidence indicating that the police officer had any authority to act on behalf of the property owner.

Here, however, Sgt. Dierdorf's testimony was not the only evidence of his agency for the Church. Indeed, Henry testified that Sgt. Dierdorf and the other security officers were there "by church's orders." Tr. p. 73. And, as indicated above, Mr. Semenick's own "rent-a-cop" statements indicate that he understood that Sgt. Dierdorf was hired by the Church to act as a security guard. From this, I believe that the jury could reasonably conclude that Sgt. Dierdorf was an agent of the Church who had the authority to ask anyone causing a disturbance on Church property, such as Mr. Semenick, to leave the Church.

B. *Lack of a Contractual Interest in the Real Property of the Church*

I also disagree with Mr. Semenick's claim the State failed to prove that he did not have a contractual interest in the church property. See I.C. § 35-43-2-2(a)(2). "A 'contractual interest in the property' is a right, title, or legal share of real property arising out of a *binding agreement between two or more parties*." Lyles, 970 N.E.2d at 143 n.3. In proving the lack of a contractual interest, the State need not disprove every conceivable contractual interest that a defendant might have in the real property at issue. Id. at 3-4. Otherwise, the State would face a potentially impossible burden to identify and refute every possible contractual interest a defendant might have in the property, which is more than due process requires. Id. at 4. Thus, some contractual interests need not be disproven because

16

they do not create any reasonable doubt that a defendant lacks a contractual interest in the property. Id. "For this reason, the State satisfies its burden when it disproves those contractual interests that are reasonably apparent from the context and circumstances under which the trespass is alleged to have occurred." Id.

Here, the only possible contractual interest that is reasonably apparent from the context and circumstances under which the trespass was alleged to have occurred is that of a parishioner or member of the Church. Mr. Semenick claims that the State failed to prove his lack of a contractual interest in the church premises because there was no testimony from the property owner directly stating that he had no such interest or documentary proof to the same effect. This characterizes the State's burden too strongly. The State need not present *direct* evidence to support each element of a crime, and it has long been held that circumstantial evidence will support a conviction. See Maul v. State, 731 N.E.2d 438, 439 (Ind. 2000).

The majority states that Mr. Semenick was a "longtime contributor, participant, and believer." Slip op., supra, at 6. It is true that Mr. Semenick testified that he had regularly attended the Church for over twenty years and that the Church considered him a "regular member," even though he had no formal membership. He also testified that he had sent his children to school at the Church. The majority wholly credits Mr. Semenick's testimony. Our constitution and common law make it the province of the jury, and not a court on appeal, to determine the credibility of such testimony. Ind. Const. art. 1, sec. 19 ("In all criminal cases whatever, the jury shall have the right to determine the law and the facts."); McHenry, 820 N.E.2d at 126. Here, the jury could have simply discredited Mr. Semenick's claims

17

regarding his membership at the Church.  See Griffin v. State, 493 N.E.2d 439, 443 (Ind. 1986) (noting that jury apparently disbelieved defendant's allegedly uncontroverted evidence that he was in another state at the time the crime at issue was committed); Morphew v. Morphew, 419 N.E.2d 770, 777 (Ind. Ct. App. 1981) (noting that uncontroverted evidence is not necessarily binding on the trier of fact and may be disbelieved and given no weight).

But even if we accept Mr. Semenick's testimony at face value, and even if Mr. Semenick was a member or regular parishioner of the Church, I cannot agree that his status as such created a "right, title, or legal share of real property arising out of a *binding agreement* between" Mr. Semenick and the Church**.**  Lyles, 970 N.E.2d at 143 n.3. (emphasis added).  Lyles is instructive both on the issue of the nature of underlying agreements and the limitations of any interest in real property they might create.

In Lyles, the defendant, a bank customer, became "irate and disrespectful" after being informed by the bank manager that he could not obtain an account statement for free.  970 N.E.2d at 142.  When the defendant refused the manager's request to leave the bank, the manager called the police.  The responding officer arrested the defendant after asking him to leave multiple times.  On appeal, the defendant claimed that the State failed to prove that he did not have a contractual interest in the bank given his status as a bank customer.  Our supreme court disagreed, noting that there was evidence that "the defendant was neither an owner nor an employee of the bank as well as evidence that the bank manager had authority to ask customers to leave the bank premises."  Id. at 143.  This evidence, the court held, "refuted each of the most reasonably apparent sources from which a person in the

18

defendant's circumstances might have derived a contractual interest in the bank's real property: as an owner, as an employee, and as an account holder." Id.

Thus, Lyles stands for the proposition that even a bank account holder, a person who actually has a written contract with the bank governing his deposits, has no right to remain on bank property after being asked to leave by someone with authority to make such a request or demand. Here, there is no suggestion that Mr. Semenick was an owner of the Church premises or that he was an employee of the Church. Only his status as a Church member or parishioner could have given him any right to be at the Church. Although there was no direct evidence that Sgt. Dierdorf was authorized to ask Church members to leave the church, the jury could, and apparently did, reasonably infer from all of the evidence that Sgt. Dierdorf, an off-duty police officer hired by the Church to act as a security officer for the Church, had such authority.

C. *Disruptive Behavior May Terminate Limited Contractual Interest*

Moreover, even someone like Mr. Semenick, with a limited right to come upon certain real property, may lose this right based on her or his behavior. This court concluded as much in Taylor v. State, 836 N.E.2d 1024, 1027 (Ind. Ct. App. 2005), where we stated that "if a student has a contractual interest in school property, that interest is not unlimited and can be violated by the student's conduct." In Taylor, the student convicted for criminal trespass was roaming around the building over two hours after his classes had ended, even after being told to wait in the front entry for a bus. The student then refused a school police officer's directions to leave the school premises. This evidence was sufficient to prove that the

student "did not have a contractual interest in the school property where and when he was asked to leave the premises." Id.

The same could be said here; even if Mr. Semenick had a limited right to be on the Church's property, he lost this limited right through his disruptive behavior. See id.; see also A.E.B. v. State, 756 N.E.2d 536, 541 (Ind. Ct. App. 2001) (holding that State presented sufficient evidence to establish that student abandoned whatever contractual interest she had in school property where her disruptive behavior rose to the level of disorderly conduct).

D. *The Location of the Disruptive Behavior: a Sunday Worship Service*

Perhaps just as important as our standard of review regarding jury verdicts is the location of Mr. Semenick's disruptive behavior, in the sanctuary of a church during an ongoing, Sunday worship service. What is disruptive behavior in one context might not rise to the level of disruptive behavior in another context. See Price v. State, 622 N.E.2d 954, 964 (Ind. 1993) (noting that "noise made during normal sleeping hours may be a nuisance, while the same or even greater noise during the day would not."); Johnson v. State, 719 N.E.2d 445, 448 (Ind. Ct. App. 1999) (noting that, in context of disorderly conduct, the State must prove that the defendant produced noise that was "too loud for the circumstances.").

Thus, while Mr. Semenick's actions might have been within the bounds of acceptable behavior at a loud, outdoor event, I cannot ignore, and the jury did not ignore, the fact that his actions occurred in the sanctuary of a church. Even though there was some indication that the Church had services that were relatively energetic, Mr. Semenick was angry, rude and, most importantly in the context of his actions, loud. In fact, Mr. Semenick was loud

20

enough to cause people at the front of the Church, during a service that included loud music, to turn around and look at the confrontation when he told Martin not to touch him. He was also loud enough in the lobby of the Church while talking to Henry that people in a nearby Church café area stopped to see what was going on.

I believe that this level of disruption on a church premises during its Sunday worship service was sufficient to terminate any limited right Mr. Semenick might have had to be on the Church premises as a member or parishioner. That the jury acquitted Mr. Semenick of disorderly conduct is of no moment or relevance to the task of determining whether the probative evidence and reasonable inferences drawn from the evidence adduced at trial and most favorable to the verdict could have allowed a jury to find Mr. Semenick guilty of criminal trespass beyond a reasonable doubt. See Beattie v. State, 924 N.E.2d 643, 648-49 (Ind. 2010) (noting that jury verdicts are not subject to appellate review on grounds that they are inconsistent and noting that the only task for the court on appeal is to review the sufficiency of the evidence supporting the jury's verdict); McNeill v. State, 936 N.E.2d 358, 360 (Ind. Ct. App. 2010) (noting that "the inner workings of juries are unknown, [and] jurors could return inconsistent verdicts for a variety of reasons, such as lenity or compromise."); McHenry, 820 N.E.2d at 126 (setting forth standard of review for claims of sufficiency of the evidence). Thus, the jury's acquittal of Mr. Semenick on the charge of disorderly conduct should have no impact on our review of the sufficiency of the evidence to support his conviction for criminal trespass. See Beattie, 924 N.E.2d at 648-49.

E.  *Refusal to Leave*

The State also presented sufficient evidence to show that Mr. Semenick refused to leave after being asked to do so by an agent of the church.  Sgt. Dierdorf testified that he asked Mr. Semenick to leave the church both before and after Mr. Semenick spoke with Henry in the church lobby.  Instead of leaving, Mr. Semenick challenged Sgt. Dierdorf's authority.  Indeed, Sgt. Dierdorf testified that when he asked Mr. Semenick to leave, Mr. Semenick responded, "I'm not leaving."  Tr. p. 106.  This clearly shows that Mr. Semenick refused to leave after being asked to do so by Sgt. Dierdorf.

Thus, I believe that the evidence favorable to the verdict, and the reasonable inferences to be drawn therefrom, would allow a reasonable trier of fact to conclude that Mr. Semenick knowingly[10] refused to leave the church premises after being asked to leave by an agent of the church and that Mr. Semenick lacked a contractual interest in the property.  This is sufficient to support his conviction for criminal trespass under Indiana Code section 35-43-2-2(a)(2).

F.  *First Amendment*

Lastly, I reject Mr. Semenick's claim that the evidence is insufficient to support his conviction in that the State failed to prove that it had "a compelling interest requiring Mr. Semenick to be removed from the worship service at Lakeview against his natural right to worship[.]"  Appellant's Br. p. 47.  Consideration of Mr. Semenick's alleged natural right to

---

[10]  Mr. Semenick's argument that he had a *bona fide* belief that he was rightfully remaining on church premises is little more than a request that this court reweigh the evidence considered by the jury and come to a conclusion that he did not act knowingly or intentionally, which is of course contrary to our standard of review.

22

worship is not a statutory element of the crime of criminal trespass. I therefore take Mr. Semenick's argument to be that his arrest violated his First Amendment right to the free exercise of religion.

But even so, Mr. Semenick did not move to dismiss the charges against him based on this alleged constitutional violation. See Baumgartner v. State, 891 N.E.2d 1131, 1135-36 (Ind. Ct. App. 2008) (noting that the failure to file a motion to dismiss raising a Constitutional challenged waives the issue on appeal). Nor is there any indication that Mr. Semenick ever presented this constitutional argument to the trial court. I therefore consider this argument waived for being presented for the first time on appeal. See Whitfield v. State, 699 N.E.2d 666, 669 (Ind. Ct. App. 1998) (noting that an argument raised for the first time on appeal is waived and will not be considered by appellate court) (citing Goodner v. State, 685 N.E.2d 1058, 1060 (Ind. 1997)).[11]

**Conclusion**

Under the applicable standard of review for claims challenging the sufficiency of the evidence supporting a jury verdict, I conclude that the State presented sufficient evidence that Sgt. Dierdorf was an agent of the Church and that Mr. Semenick had no contractual interest in Church premises. And even if Mr. Semenick had some limited right to be on the Church premises, I believe his disruptive behavior terminated that limited right. I am also of the opinion that there was sufficient evidence demonstrating that Mr. Semenick refused to leave

---

[11] Waiver notwithstanding, I would note that Mr. Semenick's criminal behavior cannot be justified on First Amendment grounds, as the criminal trespass statute is a neutral law of general applicability. See Brazauskas v. Fort Wayne-South Bend Diocese, Inc., 796 N.E.2d 286, 292-93 (Ind. 2003) (noting that the Free Exercise Clause does not exempt religiously motivated action from neutral laws of general applicability) (citing Emp't Div. v. Smith, 494 U.S. 872, 881-82 (1990)).

the Church premises after being asked to do so by Sgt. Dierdorf.  In short, I believe that the evidence presented at trial was sufficient to support the jury's conviction of Mr. Semenick's for criminal trespass.  I therefore respectfully dissent from the majority's opinion reversing that conviction.