## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Jul 08 2015, 9:12 am
CLERK
of the supreme court, court of appeals and tax court

APPELLANT PRO SE

Kyle Beals
Pendleton, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kyle Beals,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

July 8, 2015

Court of Appeals Case No.
49A02-1411-PC-776

Appeal from the Marion Superior Court

The Honorable Grant W. Hawkins, Judge

Trial Court Case No.
49G05-0812-PC-292518

**Mathias, Judge.**

[1] Kyle Beals appeals from the Marion Superior Court's denial of his petition for post-conviction relief. On appeal, Beals presents five issues for our review, which we restate as:

I.    Whether the post-conviction court erred in concluding that Beals was not denied the effective assistance of trial counsel;

II.   Whether the post-conviction court erred in concluding that Beals was not denied the effective assistance of appellate counsel;

III.  Whether the trial court abused its discretion when it failed to issue a directed verdict *sua sponte* in Beals' favor;

IV.   Whether the post-conviction court erred by failing to order that the voir dire from Beals' trial be transcribed and provided to him for purposes of pursuing his post-conviction petition; and

V.    Whether a retrial on Beals' habitual offender adjudication is prohibited by the constitutional prohibitions against double jeopardy.

We affirm.

## Facts and Procedural History

The facts regarding Beals' convictions were set forth in our memorandum decision on direct appeal as follows:

Coming home from work shortly before 1:00 a.m. on December 23, 2008, Pamela Murphy stopped at the 7-11 store for cigarettes. As she chatted with cashier Delores Booth, Beals entered the store wearing a black ski-mask, a tan-colored Carhartt-style jacket, blue jeans and white tennis shoes. Beals pulled out a black gun, pressed it to her back, pushed her against the counter, and demanded that Booth "open the register or he was going to kill" them both. Booth pulled out the register drawer and put it on the counter. Beals took the money from the drawer and ordered both women to the floor. They complied, and Beals left the store.

Booth had activated a silent alarm as she dropped to the floor, and after Beals left, she also called 9-1-1. Officer Robert Hicks responded to the 12:56 a.m. dispatch and arrived within three minutes. After receiving reports from the women, Hicks

broadcast the robber's description—a white male, approximately 6'3" and 250 pounds, wearing a ski mask, Carhartt-style jacket, and blue jeans. Subsequently, Detective Delbert Shelton arrived at the 7-11 to investigate the armed robbery.

At approximately 2:30 a.m. on the same morning, Leandro Goodman and Roger Terry were working at the Airport Marathon station/store. Beals entered wearing a black ski mask, tan Carhartt-style jacket, blue jeans, and white tennis shoes. Beals displayed a black gun and ordered both men to get on the floor; when he was unable to open the cash register, he ordered Goodman to get up and open it. Goodman opened the drawer, and Beals "snatched the money out the drawer [sic] and ran out the doorway."

Meanwhile, after finishing their shifts at a business several blocks away, Aaron Butler and Aaron Grose went to their vehicles and found that the locks on Grose's truck had frozen. Butler drove Grose to the Marathon for de-icer. As the two men approached the door, Beals exited—wearing a Carhartt-style jacket, blue jeans, and black ski mask, with a gun in his right hand and "money coming out of" his left jacket pocket. Once inside the Marathon, they confirmed that it had just been robbed.

Goodman had telephoned the police to report the robbery after Beals left the store. Dispatch reported the robbery. Officer Doug Himmel was at a nearby intersection when he heard the dispatch, and saw a blue Explorer driven by a man in a Carhartt-style jacket—Beals. The driver of another vehicle pointed at the Explorer, and Himmel followed it.

Other officers were alerted to Beals' location, and they participated in an attempted traffic stop. Beals disregarded the officers' flashing lights and fled. Eventually, Beals turned into a semi-truck parking lot. He crashed over a curb, drove around the lot in circles, and then plowed through a fence before his vehicle came to a stop. Beals then fled on foot, with several officers in pursuit—"everybody . . . yelling stop police." Himmel tackled

Beals but had difficulty controlling him. Himmel finally brought Beals to the ground and was able to subdue him.

[10] Beals was wearing a tan Carhartt-style jacket, blue jeans, and white tennis shoes. In his jacket pocket was $350.00, "crammed" in a "pile of money that was completely wadded up." Further, inside the crashed Explorer were additional bills, as well as a black ski mask, and a black BB gun was found on the pavement of the semi-truck parking lot that Beals had circled.

[11] From the Marathon store, various officers had individually transported Grose, Butler, Goodman, and Terry to the scene where Beals had been stopped. Grose testified that when he arrived at the scene, he saw Beals "standing" there "wearing the same exact stuff," including the Carhartt-style jacket, and recognized him as the "person that [he] walked past in the gas station." Butler testified that he identified Beals based on his physical stature and "[t]he clothes he was wearing," which "was a match to the gentleman that walked out of the gas station." Goodman testified that he recognized Beal[s] as "[t]he guy that robbed me" based on his wearing "the same tan jacket and jeans," and having "the same build and height." Terry testified that based on "the size of the man and the build," he recognized Beal[s] as "the man that just robbed us."

[12] Meanwhile, at the 7-11, Officer Shelton had heard the broadcast description of the Marathon armed robber and noted the similarity to the reports of the 7-11 robbery. Shelton went to where Beals had been apprehended, and observed Beals' Carhartt-style jacket, blue jeans, and white tennis shoes, as well as his stature and race. Subsequently, Shelton compiled a photo array that included Beals.

[13] On December 24, 2008, the State charged Beals. With respect to the 7-11 incident, it charged him with one count of robbery and two counts of criminal confinement (one as to Murphy, one as to Booth), all as class B felonies. With respect to the Marathon incident, it charged him with one count of robbery and two counts of criminal confinement (one as to Goodman, one as to

Terry), all as Class B felonies. It also charged Beals with one count of resisting law enforcement, as a class D felony.

[14] On January 2, 2009, Officer Shelton showed Booth the photo array. Booth unequivocally identified Beals as the man who had robbed her at gunpoint on December 23rd, signing and dating it for that purpose.

[15] On February 19, 2009, the State filed notice that it would seek to have Beals adjudicated as an habitual offender. On November 29, 2009, Beals filed a motion to suppress identification evidence. On February 5, 2010, the parties submitted a stipulation of facts and evidence regarding Beals' motion. On February 22, 2010, the trial court denied Beals' motion to suppress. Beals did not appeal that ruling.

[16] A jury trial was held March 1 – 2, 2010, and testimony to the above was heard. The jury also saw videotaped recordings of both robberies. At no time during the trial did Beals object to any identification testimony. The jury found Beals guilty as charged, and the trial court found him to be an habitual offender.

[17] On April 1, 2010, the trial court held the sentencing hearing. It sentenced Beals to twelve years on each count for the six class B felony convictions, with the three counts for the 7-11 offenses to be served concurrently, and the three counts for the Marathon station offenses to be served concurrently; however, it ordered the two robbery counts to be served consecutive to one another. For the class D felony resisting law enforcement offense, it sentenced Beals to a term of two years—consecutive to the robbery sentences. In addition, the trial court enhanced the first robbery sentence by twenty years for his being an habitual offender, for a total executed sentence of forty-six years.

*Beals v. State*, No. 49A02-1004-CR-461, 2011 WL 9122, slip op. at 2-6 (Ind. Ct.

App. Jan. 3, 2011), *trans. denied*.

[18] On direct appeal, Beals presented two issues: (1) whether the trial court abused its discretion in admitting into evidence the pre-trial identifications of Beals, and (2) whether Beals' convictions for robbery and criminal confinement violated the double jeopardy provisions of the Indiana Constitution. A panel of this court rejected the first claim but agreed with Beals that his convictions for robbery and criminal confinement constituted double jeopardy under the Indiana Constitution. *Id*. at 9-10, 14. Accordingly, we reversed his convictions for criminal confinement and remanded with instructions that the judgments thereon be vacated. *Id*. at 14.

[19] On December 11, 2012, Beals filed a *pro se* petition for post-conviction relief and declined to be represented by counsel. At the October 9, 2014, hearing held on Beals' petition, he called as witnesses his trial and appellate counsel. The trial court granted Beals' petition in part, vacating Beals' guilty plea to the habitual offender adjudication. However, the trial court denied the petition otherwise, and Beals now appeals.

## Post-Conviction Standard of Review

[20] Post-conviction proceedings are not "super appeals" through which convicted persons can raise issues they failed to raise at trial or on direct appeal. *McCary v. State*, 761 N.E.2d 389, 391 (Ind. 2002). Post-conviction proceedings instead afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Davidson v. State*, 763 N.E.2d 441, 443 (Ind. 2002). The post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Henley v. State*, 881

N.E.2d 639, 643 (Ind. 2008). Thus, on appeal from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id*. To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*. at 643-44.

[21] Where, as here, the post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we must determine if the court's findings are sufficient to support its judgment. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings under a clearly erroneous standard. *Id.* Accordingly, we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id.*

## I. Ineffective Assistance of Trial Counsel

[22] Beals first claims that his trial counsel was ineffective for a variety of reasons. Our supreme court has summarized the law regarding claims of ineffective assistance of trial counsel as follows:

> A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the

defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. The two prongs of the *Strickland* test are separate and independent inquiries. Thus, [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.

*Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001) (citations and quotations omitted).

### A. Admission of BB Gun

Beals first claims that his trial counsel was ineffective for failing to object to the admission of the BB gun found in the parking lot near where Beals was

ultimately apprehended. Beals argues that the State did not adequately lay the foundation for the admission of the gun.

[24] To lay a foundation for the admission of evidence, the proponent of the evidence must show that it has been authenticated. *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App. 2014), *trans. denied*. Under Indiana Evidence Rule 901(a),[1] authentication of evidence is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Absolute proof of authenticity is not required, and the proponent of the evidence needs to establish only a reasonable probability that the exhibit is what it is claimed. *Id*. Once this reasonable probability is shown, any inconclusiveness regarding the exhibit's connection with the events at issue goes to the exhibit's weight, not its admissibility. *Id*.

[25] Beals claims that none of the witnesses were shown the BB gun prior to its admission and that, therefore, the admission of the gun had no foundation. We disagree. When the BB gun was admitted into evidence, it was simply identified as the gun found in the parking lot where Beals had crashed his vehicle. The evidence technician who photographed and collected the weapon identified the gun as being the same one he found in the lot. Accordingly, the State properly laid a foundation for the admission of the BB gun.

---

[1] The Indiana Rules of Evidence were amended effective January 1, 2014, but the amendments did not alter the substance of Evidence Rule 901. *See Pavlovich*, 6 N.E.3d at 979 n.4. Still, we refer to the version of Evidence Rule 901 in effect at the time of Beals' trial. *See id*.

Beals argues that none of the eyewitnesses to the robberies identified the BB gun as being the one used during the robberies. This, however, goes to the evidentiary weight of the BB gun, not its admissibility. The jury was presented with evidence that a man matching Beals' description had robbed two convenience stores with a black weapon that appeared to be a semi-automatic handgun. Beals was apprehended after a police chase that ended when he crashed his vehicle in a parking lot and fled on foot. A black BB gun designed to look like a semi-automatic handgun was found in the lot where Beals crashed his vehicle. The jury could reasonably conclude that the BB gun found in the lot was one and the same as the one used in the robberies.

Moreover, even if we assume *arguendo* that Beals' trial counsel's failure to object to the admission of the BB gun fell below an objectionable standard of reasonableness, Beals would still not prevail on his claim of ineffective assistance because he has failed to demonstrate adequate prejudice. As we noted in our decision on Beals' direct appeal:

> [T]he jury viewed videotape recordings of both robberies, with the robber clearly wearing the Carhartt-style jacket, blue jeans, white tennis shoes, and a ski mask; his large stature is apparent. From their initial reports to police immediately after the robberies through their testimony at trial, all witnesses described the robber as a tall white male, garbed in a Carhartt-style jacket, blue jeans, and a black ski mask. Seen driving a vehicle "less than 500 feet from" the Marathon store, and clad in a Carhartt-style jacket, Beals was followed by Officer Himmel. Beals disregarded orders to stop, and was then pursued by Himmel and numerous other officers until he crashed his vehicle and fled on foot. When finally caught and subdued, Beals was wearing a Carhartt-style

jacket, blue jeans—which jeans, admitted as an exhibit at trial, were the same blue color as the jeans shown in the videotape recordings of the robberies, and white tennis shoes; his jacket pocket was crammed with $350.00 in loose bills; more bills were found lying in his crashed vehicle; a black ski mask was also in the vehicle; and a black BB gun was found in the lot where he had crashed the vehicle.

*Beals,* slip op. at 9-10. Thus, even if the BB gun had been excluded, ample evidence still existed to support Beals' convictions. Several witnesses testified that the robber used what appeared to be a black, semi-automatic handgun. Accordingly, we conclude that Beals did not establish that, but for his trial counsel's failure to object to the admission of the BB gun, the result of his trial would have been different.

## B. Failure to Strike a Juror

Beals next claims that his trial counsel was ineffective for failing to strike a particular juror, T.L., during voir dire. At the post-conviction hearing, Beals claimed that T.L. stated during voir dire that his wife had been the victim of a robbery on the IUPUI campus and that the robber had never been caught. Beals' trial counsel and his investigator did not recall the juror stating this. However, his trial counsel explained that, if he allowed this juror to be selected, then he "must have had some other reason why I liked him." Post-Conviction Tr. p. 17. He further explained that "I don't recall the juror [T.L.] in particular, but, you know, if I, if I chose that person, I, I chose them for a reason." *Id.* at 64.

Even if we accept Beals' claims regarding what juror T.L. stated during voir dire, i.e., that his wife had been the victim of a robbery, he cannot prevail. Beals points us to no evidence or authority suggesting that someone who is married to the victim of a crime is ineligible for jury service. Indeed, no such disqualification exists. *See* Ind. Code § 33-28-5-18 (listing disqualifications from jury service). Beals simply assumes that juror T.L. was prejudiced against him and ignored his duty as a juror to act impartially. However, this is mere speculation. Accordingly, Beals has not established that, but for his trial counsel's failure to strike juror T.L., the result of his trial would have been different.

### C. Failure to Object to Pre-Trial Identification Evidence

Beals also claims that his trial counsel rendered ineffective assistance by failing to object at trial to evidence regarding the victims' pre-trial identification of Beals as the man who robbed them. As we noted in our decision in Beals' direct appeal, Beals' trial counsel did file a pre-trial motion to suppress evidence regarding the pre-trial identifications, but the trial court denied this motion. At trial, Beals' trial counsel did not object to the evidence because he thought that Beals' complaints regarding the pre-trial identifications were not meritorious.

Beals now claims that his trial counsel's failure to object to the pre-trial identification evidence precluded appellate review of the issue. In our decision in Beals' direct appeal, we did acknowledge Beals' failure to object to the pre-trial identification evidence, and we also stated that Beals would therefore have

to demonstrate fundamental error to obtain a reversal based on this issue. *See Beals*, slip op. at 7-8. However, in rejecting Beals' claims, we held that the trial court did not abuse its discretion in admitting evidence regarding the pre-trial identifications. *See id*. at 8-9. Thus, we addressed Beals' appellate argument regarding the pre-trial identifications on the merits and found it to be lacking. Accordingly, even if Beals' trial counsel had objected to the pre-trial identification evidence, the result of his trial would not have been different because the trial court properly admitted the evidence.[2]

[32] Moreover, in Beals' direct appeal, we held that even if the admission of the pre-trial identification evidence was improper, it was harmless error, i.e., it did not contribute to the verdict. *Id*. at 9. If the admission of the pre-trial identification evidence was harmless, it would also be impossible for Beals to establish that he was prejudiced by the admission of the evidence. *See Baer v. State*, 942 N.E.2d 80, 106 (Ind. 2011) (holding that counsel's decision not to present a confrontation-clause issue on direct appeal did not prejudice defendant because the admission of the evidence at issue was harmless error).

[33] We therefore conclude that Beals has not established that his trial counsel was constitutionally ineffective for failing to object to the pre-trial identification evidence.

---

[2]  To the extent that Beals now claims we erred in concluding that the pre-trial identification evidence was admissible, he cannot prevail.  Because this issue was decided against him on direct appeal, it may not be relitigated in post-conviction proceedings. *See Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000) (noting that when an issue is decided on direct appeal, the doctrine of *res judicata* applies, thereby precluding its review in post-conviction proceedings).

*D. Failure to Impeach a Witness*

Beals' next argument is that his trial counsel was ineffective for not impeaching the testimony of Officer Fredrick Lantzer ("Officer Lantzer") regarding whether he was at the hospital when he came into possession of the clothes Beals was wearing when arrested, clothes that were admitted into evidence at Beals' trial. Beals argues that Officer Lantzer's testimony was inconsistent with the testimony of evidence technician David Smiley ("Smiley"), who testified that he obtained the clothes from an empty emergency room at Wishard Hospital. In contrast, Officer Lantzer testified that he was at the emergency room and had handed the clothing to Smiley. Beals also notes that neither the police incident report nor the probable cause affidavit mention that Officer Lantzer traveled to the emergency room. Beals contends that, because it went unchallenged, Officer Lantzer's testimony "took on great weight before the jury." Appellant's Br. p. 15.

We first note that Officer Lantzer's testimony was not contradicted by either the police report or the probable cause affidavit. The fact that these documents do not mention Officer Lantzer's presence in the emergency room does not necessarily mean that Officer Lantzer was not at the emergency room. Furthermore, the post-conviction court noted that one police report, as quoted in the pre-sentence investigation report, clearly indicated that Officer Lantzer was, in fact, at the emergency room:

> Officer Lantzer . . . followed the ambulance to Wishard Hospital that was transporting the suspect, Mr. Beals. When they arrived on the scene to Wishard Hospital, Officer Lantzer was able to

secure all the clothing from the suspect, then pass that clothing off to E[vidence] T[echnician] Smiley, who arrived at Wishard a short time thereafter.

Appellant's App. p. 96. Thus, any impeachment of Officer Lantzer's testimony would have been of little value given the corroboration of his testimony in the police report. Beals has demonstrated neither that the performance of his trial counsel was deficient for not attempting to impeach Officer Lantzer's testimony nor that the result of the trial would have been different had his trial counsel so attempted to impeach Officer Lantzer's testimony.

### E. Failure to Request Lesser-Included Offense Instruction

Beals also contends that his trial counsel was ineffective for failing to request that the jury be given an instruction on the lesser-included offense of Class C felony robbery. Beals claims an evidentiary dispute at trial with regard to whether Beals' use of a BB gun constituted a deadly weapon for purposes of elevating robbery from a Class C to a Class B felony. *See* Ind. Code § Ind. Code § 35-42-5-1 (1984)[3] (providing that robbery was a Class C felony but a Class B felony if committed while armed with a deadly weapon). He therefore argues that he was entitled to a jury instruction on the lesser-included offense of Class C felony robbery and that his trial counsel was ineffective for failing to request such an instruction.

---

[3] We refer to the version of the statute in effect at the time of the commission of the offense. *See Culbertson v. State*, 792 N.E.2d 573, 578 (Ind. Ct. App. 2003) (noting that the statute in effect at the time the underlying offense was committed governs a defendant's proceeding).

[37] Regardless of whether Beals would have been entitled to an instruction on the lesser-included offense of Class C felony robbery, we cannot say that his trial counsel was ineffective for failing to request such an instruction. The defense theory at trial was that Beals was not the individual who had committed the robberies. As Beals' trial counsel explained at the post-conviction hearing:

> the defense was it wasn't you, so why would I say that it was you but it wasn't an armed robbery, it was a lesser robbery?
>
> * * *
>
> to me if you, you lose credibility when you try to argue out of both sides of your mouth, so to speak. Well, he, he wasn't there but if he was, it wasn't, you know, an armed robbery, it was some lesser offense and I think that affects the weight of your primary argument[.]

Post-Conviction Tr. pp. 52, 65.

[38] Thus, Beals' counsel's decision not to seek a lesser-included offense instruction was a strategic decision based upon the defense theory that Beals was not the robber. We will not second-guess this strategic decision with the benefit of hindsight. *See Brown v. State*, 24 N.E.3d 529, 535 (Ind. Ct. App. 2015) (noting that a decision not to tender a lesser-included offense does not constitute ineffective assistance of counsel even where the lesser-included offense is inherently included in the greater offense and where that choice ultimately proves detrimental to the defendant).

*F.  Failure to Object to Jury Instruction Defining Deadly Weapon*

[39]  Beals' last allegation of ineffective assistance of trial counsel involves his counsel's failure to object to a jury instruction which stated:

> The term deadly weapon is defined by law as meaning:
>
> 1.  A loaded or unloaded firearm; or
>
> 2. Any weapon, device, taser, electronic stun weapon, equipment, chemical substance, or other material that in the manner it is used, or could ordinarily be used, is readily capable of causing serious bodily injury.

Appellant's App. p. 40. This instruction is a correct statement of the law, as it tracks the language of the statute defining the term "deadly weapon." *See* Ind. Code § 35-41-1-8(a) (2006).[4]

[40]  According to Beals, this instruction permitted the jury to find him guilty of robbery with a deadly weapon under subsection (2), which deals with weapons other than a loaded or unloaded firearm. Beals claims this was improper because he was charged with using a "handgun" which is defined by statute as a type of "firearm." *See* Ind. Code § 35-47-1-6 (1983). Accordingly, Beals argues that the State had to prove that he possessed a firearm, whereas the challenged instruction allowed the jury to find him guilty even if it found that he used a BB gun, which is not a firearm. *See Miller v. State*, 616 N.E.2d 750, 757 n.13 (Ind.

---

[4]  This statue has since been recodified at Ind. Code § 35-31.5-2-86 (2012) with no substantive changes.

Ct. App. 1993) (holding that a pellet gun cannot be considered a "handgun" because it uses carbon dioxide as the propellant, which cannot explode).[5]

[41] Beals' argument, however, overlooks the actual language of the charging information alleging that he committed robbery while armed with a deadly weapon. The information did not charge that Beals used a "handgun." Instead, it alleged that Beals committed robbery "while armed with a deadly weapon, that is: *an air-powered BB replica handgun*[.]" Direct Appeal App. p. 31-33 (emphasis added).

[42] By charging Beals with the use of "an air-powered BB replica handgun," the State was not required to prove that the weapon used was an "actual handgun," i.e., a "firearm." Instead, the jury could properly find that a BB gun was a deadly weapon under subsection (2) of the instruction and the statute on which it was based. *See Davis v. State*, 835 N.E.2d 1102, 1112 (Ind. Ct. App. 2005) (noting that pellet guns and BB guns can be considered deadly weapons even though they are not firearms and further noting that even disabled or inoperable pellet guns are deadly weapons within the meaning of the robbery statute) (citing *Merriweather v. State,* 778 N.E.2d 449, 457 (Ind. Ct. App. 2002);*Whitfield v. State,* 699 N.E.2d 666, 670 (Ind. Ct. App. 1998)).

---

[5] S*ee id.* at 758 (Rucker, J., dissenting in relevant part) (concluding that a pellet gun using carbon dioxide gas did fit the statutory definition of a "firearm" because it expelled a projectile by way of an explosion, i.e., "sudden violence from internal energy caused by the pressure from $CO_2$ gas.").

Because the instruction at issue was a correct statement of the law, and because Beals was charged with the use of a BB gun, not a firearm, we cannot say that his trial counsel was ineffective for failing to object to the instruction.

## II. Ineffective Assistance of Appellate Counsel

Beals also claims that his appellate counsel was constitutionally ineffective. When we review claims of ineffective assistance of appellate counsel, we use the same standard applied to claims of ineffective assistance of trial counsel. *Harris v. State*, 861 N.E.2d 1182, 1186 (Ind. 2007). That is, the post-conviction petitioner must show that appellate counsel's performance fell below an objective standard of reasonableness and that but for the deficient performance of counsel, a reasonable probability exists that the result of the proceeding would have been different. *Id.*

We must consider the totality of an attorney's performance to determine whether the client received constitutionally adequate assistance and must be "particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made." *Reed v. State*, 856 N.E.2d 1189, 1196 (Ind. 2006). Moreover, ineffective assistance is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel. *Id.*

[46] Our supreme court has noted that claims of ineffective assistance of appellate counsel generally fall into three categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Id.* at 1195. To show that counsel was ineffective for failing to raise an issue on appeal, the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential. *Id.* To evaluate the performance prong when counsel failed to raise issues upon appeal, we apply the following test: (1) whether the unraised issues are significant and obvious from the face of the record, and (2) whether the unraised issues are "clearly stronger" than the raised issues. *Id.* If the analysis under this test demonstrates deficient performance, then we examine whether, "the issues which . . . appellate counsel failed to raise, would have been clearly more likely to result in reversal or an order for a new trial." *Id.*

## A. Failure to Claim Ineffective Assistance on Direct Appeal

[47] Beals first briefly argues that his appellate counsel was ineffective for failing to present on direct appeal his claims of ineffective assistance of trial counsel. We strongly disagree.

[48] For almost twenty years, our courts have held that post-conviction proceedings are the preferred forum for adjudicating claims of ineffective assistance of counsel. *Rogers v. State*, 897 N.E.2d 955, 964 (Ind. Ct. App. 2008) (citing *McIntire v. State,* 717 N.E.2d 96, 101 (Ind. 1999); *Woods v. State,* 701 N.E.2d 1208, 1219 (Ind. 1998)). Post-conviction proceedings are the preferred forum for

presenting claims of ineffective assistance because such claims usually require the development of new facts not present in the trial record. *Id*. at 964-65 (citing *McIntire,* 717 N.E.2d at 101).

[49] Although a defendant is not prohibited from presenting a claim of ineffective assistance of counsel on direct appeal, if he chooses to do so, claims of ineffective assistance may not be presented in subsequent post-conviction proceedings. *Id.* at 965 (citing *McIntire*, 717 N.E.2d at 102; *Woods,* 701 N.E.2d at 1220). "[T]his rule [should] deter all but the most confident appellants from asserting any claim of ineffectiveness on direct appeal," *Woods*, 701 N.E.2d at 1220, and it is no surprise that claims of ineffective assistance presented on direct appeal almost always fail. *Id.* at 1216 (citing *United States v. Taglia,* 922 F.2d 413, 418 (7th Cir. 1991)).

[50] Thus, Beals' appellate counsel followed the strongly preferred procedure by not presenting any claims of ineffective assistance of trial counsel on direct appeal. Beals' appellate counsel's choice was prudent and did not constitute ineffective assistance.

## B. Failure to Claim Insufficient Evidence

[51] Beals also claims that his appellate counsel was ineffective for failing to present on direct appeal a claim that the evidence was insufficient to support his convictions for Class B felony robbery while armed with a deadly weapon. Yet again, Beals claims that the charging information alleged that he used a "handgun," defined as a type of "firearm," which an air-powered BB gun is not.

However, as noted above, the State did not charge Beals with using a "handgun" to commit the robberies. Instead, the State alleged that Beals used "an air-powered BB replica handgun[.]" Direct Appeal App. pp. 31-33. Beals does not even deny that he used a BB gun in the robberies. He instead simply argues that the BB gun was not a handgun because it was not a firearm. However, the State was not required to prove that Beals used a "handgun," it was required to prove that he used an air-powered BB replica handgun, and ample evidence existed to prove this. Specifically, the police found a black BB gun that was designed to look like a semi-automatic handgun in the lot where Beals crashed his vehicle, and the witnesses to the robberies testified that the robber used what appeared to be a black, semi-automatic handgun. Under these facts and circumstances, Beals' appellate counsel was not ineffective for failing to present this meritless claim of insufficient evidence on direct appeal.

## C. Admission of the Photo Array

[52] Beals next claims that his appellate counsel was ineffective for failing to claim on direct appeal that the admission of the photo array was impermissible because it occurred after he was charged but was done without notification to Beals or the presence of his counsel. Again, however, Beals' argument is based on a flawed legal presumption.

[53] Although the presence of counsel during a physical line-up that occurs after adversary judicial proceedings have begun is a right, *see Parsley v. State*, 557 N.E.2d 1331, 1334 (Ind. 1990), no constitutional right to the presence of

counsel when a witness is shown a photographic array exists. *Peterson v. State*, 514 N.E.2d 265, 268 (Ind. 1987) (citing *United States v. Ash*, 413 U.S. 300, 321 (1973) ("We hold, then, that the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender.")).

[54] Because Beals' argument with regard to the photographic array is legally baseless, we cannot fault his appellate counsel for failing to present this meritless claim on direct appeal.[6]

## III. Directed Verdict

[55] Beals also presents, as a free-standing claim of error, that the trial court should have, *sua sponte*, ordered a directed verdict in his favor because the State failed to prove that the weapon used during the robberies was a handgun. Beals' argument fails for at least two reasons. First, this is simply yet another attempt by Beals to claim that the State was required to prove that he used a handgun, and therefore a firearm, during the robberies. As discussed above, however, the State did not allege that Beals used a "actual handgun," but instead alleged that he used an "air-powered BB replica handgun."

[56] More importantly, Beals brings this claim as a free-standing claim of error. However, "[i]n post-conviction proceedings, complaints that something went awry at trial are generally cognizable only when they show deprivation of the

---

[6] Beals also briefly claims that the cumulative effect of the alleged errors of his counsel require reversal. However, because we have determined that his counsel's alleged errors were not errors at all, this argument fails.

right to effective counsel or issues demonstrably unavailable at the time of trial or direct appeal." *Sanders v. State*, 765 N.E.2d 591, 592 (Ind. 2002). Beals makes no claim that this claim was demonstrably unavailable to him at the time of his trial or direct appeal. He may not bring it as a free-standing claim of error on direct appeal. *See Timberlake v. State*, 753 N.E.2d 591, 597-98 (Ind. 2001) (noting that if an issue is known and available, but not raised on direct appeal, it is waived for purposes of post-conviction relief and that most free-standing claims of error are not available in a postconviction proceeding because of the doctrines of waiver and res judicata).

## IV. Failure to Order Transcript of Jury Voir Dire

[57] Beals next argues that the post-conviction court abused its discretion by failing to deliver to him transcripts of the voir dire of the jury panel. Beals claims that he repeatedly asked the post-conviction court for the transcript of his trial, including the voir dire of the jury. Despite this, no transcript of the voir dire was ever made, and Beals therefore had no access to such a transcript at the post-conviction proceedings. In denying his petition for post-conviction relief, the post-conviction court noted that Beals had failed to present the voir dire transcript as evidence. Beals claims that he was unable to do so because the trial court never responded to his requests for a transcript of the voir dire.

[58] Beals did request by motion a copy of the record of proceedings of his trial. At the post-conviction hearing, Beals had a copy of the record of his trial. However, the record of the trial did not include a transcript of the voir dire of the jury. *See* Trial Tr. p. 13 (noting simply "VOIR DIRE" and "JURY

SELECTED, ALL JURORS IN OPEN COURT"). Although Beals sent a request to the trial court clerk asking for a copy of the trial record, including the voir dire, we have found nothing in the record indicating that Beals formally requested the post-conviction court by motion to order the trial court clerk prepare a transcript of the voir dire specifically. We therefore cannot say that the post-conviction court abused its discretion.

[59] Moreover, as noted above, even if we assume that Beals' recollection of the voir dire was correct and that juror T.L. indicated that his wife had been the victim of a robbery, Beals has not demonstrated any prejudice.

## V. Retrial on Habitual Offender Enhancement

[60] Lastly, Beals claims that the post-conviction court erred in scheduling a new trial on the habitual offender adjudication that the post-conviction court vacated. According to Beals, retrial on the habitual offender adjudication would constitute impermissible double jeopardy.

[61] Generally, constitutional prohibitions of double jeopardy bar retrial when a defendant's conviction is reversed due to insufficient evidence because such a reversal is tantamount to an acquittal. *Dexter v. State*, 959 N.E.2d 235, 240 (Ind. 2012) (citing *Burks v. United States,* 437 U.S. 1, 16-17 (1978)). However, retrial on a sentencing enhancement based on a prior conviction is permitted even where the enhancement is reversed because of insufficient evidence. *Id*. (citing *Monge v. California*, 524 U.S. 721, 727-34 (1998); *Jaramillo v. State*, 823 N.E.2d

1187, 1191 (Ind. 2005)). Accordingly, no double jeopardy prohibition against holding a retrial on Beals' vacated habitual offender adjudication exists.

## Conclusion

The post-conviction court did not clearly err in rejecting Beals' claims of ineffective assistance of trial and appellate counsel. The trial court did not err in failing to *sua sponte* order a directed verdict in favor of Beals. The post-conviction court did not abuse its discretion by failing to provide Beals with a transcript of the voir dire. Lastly, Beals' retrial on the habitual offender enhancement does not constitute double jeopardy.

Affirmed.

May, J., and Robb, J., concur.